**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONTANA WILDLIFE
FEDERATION; THE WILDERNESS
SOCIETY; NATIONAL AUDUBON
SOCIETY; NATIONAL WILDLIFE
FEDERATION; MONTANA
AUDUBON,

    *Plaintiffs-Appellees*,

  v.

DEB HAALAND, in her official
capacity as Secretary of the Interior;
DONATO JUDICE, in his official
capacity as Montana Bureau of Land
Management State Director; BUREAU
OF LAND MANAGEMENT; U.S.
DEPARTMENT OF THE INTERIOR,

    *Defendants-Appellants*,

STATE OF WYOMING; WESTERN
ENERGY ALLIANCE,

    *Intervenor-Defendants-
    Appellees*,

 and

No. 20-35609

D.C. No.
4:18-cv-00069-
BMM

OPINION

STATE OF MONTANA,

*Intervenor-Defendant*.

---

MONTANA WILDLIFE FEDERATION; THE WILDERNESS SOCIETY; NATIONAL AUDUBON SOCIETY; NATIONAL WILDLIFE FEDERATION; MONTANA AUDUBON,

*Plaintiffs-Appellees*,

v.

DEB HAALAND, in her official capacity as Secretary of the Interior; DONATO JUDICE, in his official capacity as Montana Bureau of Land Management State Director; BUREAU OF LAND MANAGEMENT; U.S. DEPARTMENT OF THE INTERIOR,

*Defendants*,

STATE OF WYOMING; STATE OF MONTANA,

*Intervenor-Defendants*,

and

No. 20-35614

D.C. No.
4:18-cv-00069-
BMM

WESTERN ENERGY ALLIANCE,

*Intervenor-Defendant-Appellant*.

MONTANA WILDLIFE
FEDERATION; THE WILDERNESS
SOCIETY; NATIONAL AUDUBON
SOCIETY; NATIONAL WILDLIFE
FEDERATION; MONTANA
AUDUBON,

*Plaintiffs-Appellees*,

v.

DEB HAALAND, in her official
capacity as Secretary of the Interior;
DONATO JUDICE, in his official
capacity as Montana Bureau of Land
Management State Director; BUREAU
OF LAND MANAGEMENT; U.S.
DEPARTMENT OF THE INTERIOR,

*Defendants*,

WESTERN ENERGY ALLIANCE;
STATE OF MONTANA,

*Intervenor-Defendants*,

and

No. 20-35615

D.C. No.
4:18-cv-00069-
BMM

STATE OF WYOMING,

> *Intervenor-Defendant-Appellant*.

Appeal from the United States District Court
for the District of Montana
Brian M. Morris, Chief District Judge, Presiding

WESTERN WATERSHEDS
PROJECT; CENTER FOR
BIOLOGICAL DIVERSITY,

> *Plaintiffs-Appellees*,

 v.

DEB HAALAND, Secretary of
Interior; BUREAU OF LAND
MANAGEMENT, an agency of the
United States,

> *Defendants*,

WESTERN ENERGY ALLIANCE,

> *Intervenor-Defendant*,

 and

STATE OF WYOMING,

> *Intervenor-Defendant-*

No. 20-35291

D.C. No.
1:18-cv-00187-
REB

*Appellant.*

WESTERN WATERSHEDS
PROJECT; CENTER FOR
BIOLOGICAL DIVERSITY,

    *Plaintiffs-Appellees*,

  v.

DEB HAALAND, Secretary of
Interior; BUREAU OF LAND
MANAGEMENT, an agency of the
United States,

    *Defendants-Appellants*,

 and

STATE OF WYOMING; WESTERN
ENERGY ALLIANCE,

    *Intervenor-Defendants*.

No. 20-35293

D.C. No.
1:18-cv-00187-
REB

| WESTERN WATERSHEDS PROJECT; CENTER FOR BIOLOGICAL DIVERSITY, | No. 20-35294 |
|---|---|
| | D.C. No. 1:18-cv-00187-REB |

WESTERN WATERSHEDS
PROJECT; CENTER FOR
BIOLOGICAL DIVERSITY,

*Plaintiffs-Appellees*,

v.

DEB HAALAND, Secretary of
Interior; BUREAU OF LAND
MANAGEMENT, an agency of the
United States,

*Defendants*,

STATE OF WYOMING,

*Intervenor-Defendant*,

and

WESTERN ENERGY ALLIANCE,

*Intervenor-Defendant-
Appellant*.

Appeal from the United States District Court
for the District of Idaho
Ronald E. Bush, Magistrate Judge, Presiding

WESTERN WATERSHEDS
PROJECT; CENTER FOR

No. 22-35532

BIOLOGICAL DIVERSITY,

    *Plaintiffs-Appellees*,

  v.

DEB HAALAND, Secretary of
Interior; BUREAU OF LAND
MANAGEMENT, an agency of the
United States,

    *Defendants*,

STATE OF WYOMING; WESTERN
ENERGY ALLIANCE,

    *Intervenor-Defendants*,

 and

CHESAPEAKE EXPLORATION,
L.L.C.,

    *Intervenor-Defendant-
Appellant*.

D.C. No.
1:18-cv-00187-
REP

WESTERN WATERSHEDS
PROJECT; CENTER FOR
BIOLOGICAL DIVERSITY,

    *Plaintiffs-Appellees*,

  v.

No. 22-35533

D.C. No.
1:18-cv-00187-
REP

DEB HAALAND, Secretary of Interior; BUREAU OF LAND MANAGEMENT, an agency of the United States,

　　*Defendants*,

STATE OF WYOMING; WESTERN ENERGY ALLIANCE; CHESAPEAKE EXPLORATION, L.L.C.,

　　*Intervenor-Defendants*,

 and

ANSCHUTZ EXPLORATION CORPORATION,

　　*Intervenor-Defendant-Appellant*.

Appeal from the United States District Court
for the District of Idaho
Raymond Edward Patricco, Jr., Magistrate Judge, Presiding

| MONTANA WILDLIFE FEDERATION; THE WILDERNESS SOCIETY; NATIONAL AUDUBON SOCIETY; NATIONAL WILDLIFE FEDERATION; MONTANA AUDUBON, | No. 22-35549<br><br>D.C. No.<br>4:18-cv-00069-BMM |

*Plaintiffs-Appellees*,

v.

DEBRA ANNE HAALAND, in her official capacity as Secretary of the Interior; DONATO JUDICE, in his official capacity as Montana Bureau of Land Management State Director; BUREAU OF LAND MANAGEMENT; U.S. DEPARTMENT OF THE INTERIOR,

    *Defendants*,

WESTERN ENERGY ALLIANCE; STATE OF WYOMING; STATE OF MONTANA,

    *Intervenor-Defendants*,

 and

ANSCHUTZ EXPLORATION CORPORATION,

    *Intervenor-Defendant-
    Appellant*,

 and

CHESAPEAKE EXPLORATION,

LLC; CONTINENTAL RESOURCES,
INC., Proposed Intervenor-
Defendants,

　　*Movants*.

Appeal from the United States District Court
for the District of Montana
Brian M. Morris, Chief District Judge, Presiding

Argued and Submitted September 29, 2023 as to Nos. 22-
35532, 22-35533, and 22-35549
Argued and Submitted May 6, 2021 as to Nos. 20-35609,
20-35614, 20-35615, 20-35291, 20-35293, and 20-35294
Submission Withdrawn July 16, 2021 as to Nos. 20-35609,
20-35614, 20-35615, 20-35291, 20-35293, and 20-35294
Resubmitted September 29, 2023 as to Nos. 20-35609, 20-
35614, 20-35615, 20-35291, 20-35293, and 20-35294
Portland, Oregon

Filed January 17, 2025

Before:  Mary H. Murguia, Chief Judge, and Danny J.
Boggs[*] and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Boggs

---

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the
U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

# SUMMARY[**]

## Environmental Law / Oil and Gas Leases

The panel affirmed in part and reversed in part the district court's judgments in actions brought in Montana (*Montana Wildlife Federation*) and Idaho (*Western Watersheds*) by several environmental protection organizations challenging the policies that governed oil and gas lease sales conducted by the Bureau of Land Management ("BLM") on protected sage-grouse habitat.

In 2015, BLM amended several of its land use management plans to promote the recovery of the greater sage-grouse habitat by prioritizing oil and gas leasing development outside of sage-grouse habitat, and issued Instruction Memoranda (IMs), establishing procedures to implement this objective and governing public participation in the lease sales. In 2018, BLM revised the documents in two ways: IM 2018-026 adopted new language specifying that the requirement to prioritize oil and gas leases outside of sage-grouse habitat applied only where there was a "backlog" in the administrative capacity to process expressions of interest in land parcels; and IM 2018-034 shortened severely the public comment period required for National Environmental Policy Act (NEPA) review of the parcels, and for protecting lease sales under the Federal Land Policy and Management Act (FLPMA).

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Jurisdiction

Addressing the Phase One summary judgment order by the Montana district court in *Montana Wildlife Federation*, the panel held that the component of the order vacating IM 2018-026 was not injunctive in nature, and the court lacked jurisdiction to review it. The district court's vacatur of the lease sales, however, did require further action by the government and was injunctive in nature, and was appealable under 28 U.S.C. § 1292(a)(1).

Addressing the Idaho district court's Phase One order in *Western Watersheds*, the panel held that the issuance of IM 2021-027 mooted the appeal of the portion of the order setting aside the public participation provisions of IM 2018-034, and therefore there was no need to determine whether the component of the district court's order replacing provisions of IM 2018-034 with corresponding provisions of IM 2021-027 was injunctive. As to the vacatur of the lease sales, the order had the practical effect of entering an injunction such that an immediate appeal was the only effective way to challenge it, and there was jurisdiction to review it.

The panel held that it lacked jurisdiction to review the Idaho district court's order in *Western Watersheds* denying the motion to sever and transfer claims raised in the initial complaint, where the district court's order addressed claims challenging lease sales other than the Phase One lease sales at issue in this appeal.

The panel held that the notice of appeal by intervenor Anschutz Exploration Corporation (AEC), filed within 60 days of the judgment but before its intervention motion was denied, was timely. Intervenor Chesapeake Exploration, LLC's notice of appeal was untimely because Chesapeake

did not file a motion to extend the time for filing an appeal and filed a notice of appeal outside of the 60-day window.

The panel held that plaintiffs had Article III standing to challenge the government's actions because plaintiffs sufficiently established an injury-in-fact to support standing.

Merits

Addressing the Idaho district court's determination in *Western Watersheds* that the Phase One lease sales conducted under IM 2018-034 violated the public participation requirements of NEPA and FLPMA, the panel concluded that BLM (1) violated NEPA with respect to certain sales when it eliminated in some instances and severely shortened in others the various public participation periods for NEPA review during the Phase One lease sales without providing a "reasoned explanation" for the change; and (2) violated FLMPA when it limited participation in the Phase One lease sales without providing an adequate explanation for its change in policy.

Addressing the Montana district court's determination in *Montana Wildlife Federation* that the June 2018 Wyoming lease sales conducted under IM 2018-026 violated FLMPA, the panel held that IM 2018-026 was plainly inconsistent with the 2015 Plan, and the June 2018 Wyoming leasing decisions did not comply with the 2105 Plan and violated FLMPA.

The panel rejected intervenor AEC's argument that both district courts violated Fed. R. Civ. P. 19 and the Due Process Clause by vacating its lease rights without first joining it in the proceedings. The panel held that the district court did not violate Rule 19 in granting summary judgment in AEC's absence where AEC was adequately represented

by the Alliance—a regional trade association of which AEC was a member—in the proceedings before the district court. Any error in the district court's failure to join AEC before issuing summary judgment was harmless.

Addressing the remedy, the panel held that the Montana district court in *Montana Wildlife Federation* did not abuse its discretion in determining that the seriousness of the agency's errors outweighed the disruptive consequence to the leaseholders and government agencies, and vacating the lease sales. The panel held that the Idaho district court in *Western Watersheds* abused its discretion in vacating the Phase One lease sales because the disruptive consequences of lease vacatur significantly outweighed the seriousness of the agency's procedural error.

Concurring in part and dissenting in part, Sixth Circuit Judge Boggs concurred with the majority in its holdings on jurisdiction and standing in both cases, and accepted the panel's merits analysis in *Western Watersheds*. However, he would hold that the June 2018 Wyoming lease sales in *Montana Wildlife Federation* did not violate FLPMA, and he would reach the merits of intervenor Chesapeake's appeal in *Western Watersheds*.

## COUNSEL

Michael S. Freeman (argued) and Rumela Roy, Earthjustice, Denver, Colorado; Timothy J. Preso, Earthjustice, Bozeman, Montana; Laurence J. Lucas (argued), Sarah Stellberg, and Todd C. Tucci, Advocates for the West, Boise, Idaho; Andrew R. Missel, Advocates for The West, Portland, Oregon; for Plaintiffs-Appellees.

Daniel Halainen (argued), Luther L. Hajek, Robert P. Stockman, and Kevin W. McArdle, Attorneys, Appellate Section, Environment & Natural Resources Division; Eric Grant, Deputy Assistant Attorney General; Jonathan D. Brightbill, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; Philip C. Lowe, Attorney, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; Christine G. England, Assistant United States Attorney, United States Department of Justice, Boise, Idaho; for Defendants-Appellants.

Malinda Morain (argued) and Bret Sumner, Beatty & Woznaik PC, Denver, Colorado; D. David DeWald, Shannon Leininger, and Elliot Adler, Assistant Attorneys General; James Kaste (argued), Deputy Attorney General; Wyoming Attorney General's Office, Cheyenne, Wyoming; Mark D. Gibson (argued), Holland & Hart LLP, Boulder, Colorado; Andrew C. Lillie and Alexander D. White, Holland & Hart LLP, Denver, Colorado; William E. Sparks (argued), Jones Walker LLP, the Woodlands, Texas; Jessica B. Livingston, Hogan Lovells US LLP, Denver, Colorado; Michelle M. Sullivan and Adrian Miller, Sullivan Miller Law PLLC, Billings, Montana; Cherese D. McLain, MSBT Law Chtd., Boise, Idaho; Lee Radford, Parson Behle & Latimer, Idaho Falls, Idaho; Dale Schowengerdt, Landmark

Law PLLC, Helena, Montana; for Intervenor-Defendants-Appellees and Intervenor-Defendants-Appellants.

Daniel Halainen, Arielle M. Jeffries, and Robert Lundman, Attorneys, Environment & Natural Resources Division; Todd Kim, Assistant Attorney General, United States Department of Justice, Washington, D.C.; for Amicus Curiae United States of America.

## OPINION

BERZON, Circuit Judge:

### Contents

I.   BACKGROUND .....................................................20

  A.   **Factual and Regulatory Background** .............20

    i.   Oil and Gas Leasing Under FLPMA .................20

    ii.   NEPA Requirements .....................................22

    iii.   2015 Resource Management Plan Amendments 22

    iv.   Instruction Memoranda .................................25

    v.   Lease Sales....................................................29

  B.   **Procedural Background** ..................................32

    i.   Montana Litigation (*Montana Wildlife Federation*) ...............................................................32

    ii.   Idaho litigation (*Western Watersheds Project*) 34

II.   JURISDICTION .....................................................36

A.    The Phase One Summary Judgment Orders.36

    i.    *Montana Wildlife Federation* Phase One Order 38

    ii.    *Western Watersheds* Phase One Order ...........43

B.    The Venue Order in Western Watersheds .....45

C.    The Intervenor Claims ...................................49

D.    Standing ............................................................51

III.    MERITS ANALYSIS ...........................................53

A.    The Participation Claims ................................55

    i.    Whether the Lease Sales Complied with NEPA 57

    ii.    Whether the Lease Sales Complied with
FLPMA...................................................................62

    iii.    Harmlessness..................................................64

B.    The Prioritization Claims................................66

    i.    Whether IM 2018-026 Violates FLPMA ...........66

    ii.    Whether the June 2018 Wyoming Lease Sale
Violated FLPMA .......................................................74

C.    The Intervention Claims.................................76

D.    The Remedy.......................................................82

    i.    *Montana Wildlife Federation*.............................83

    ii.    *Western Watersheds* .......................................86

IV.    Conclusion ..........................................................87

Several environmental protection organizations challenge the policies that governed oil and gas lease sales conducted by the Bureau of Land Management (BLM or Bureau) on protected sage-grouse habitat. They raise two merits issues on appeal: one procedural and one substantive. The procedural issue is whether the Bureau provided adequate opportunities for public participation during the environmental review and lease sale process. The substantive question is whether the agency's administration of those sales adequately "prioritized" oil and gas development outside of greater sage-grouse habitat, as required by its Resource Management Plans.

In 2015, BLM amended several of its land use management plans to promote the recovery of the greater sage-grouse, a species threatened by loss of habitat in the western United States. The 2015 Plan Amendments required that action be taken to prioritize oil and gas leasing development outside of sage-grouse habitat, a requirement referred to as the "Prioritization Objective." The agency then issued guidance documents, or Instruction Memoranda (IMs), establishing procedures to implement the Prioritization Objective and governing public participation in the lease sales.

In 2018, the agency revised its guidance documents in two important ways. First, IM 2018-026 adopted new language specifying that the requirement to prioritize oil and gas leasing outside of sage-grouse habitat applied only where there was a "backlog" in the agency's administrative capacity to process expressions of interest in land parcels. Second, IM 2018-034 shortened severely the public comment period required for National Environmental Policy Act (NEPA) review of the parcels, and for protesting lease

sales under the Federal Land Policy and Management Act (FLPMA).

The plaintiffs are environmental-protection organizations that filed suit in Idaho and Montana, alleging (as relevant here) that certain lease sales conducted under IM 2018-026 and IM 2018-034 violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, NEPA, 42 U.S.C. §§ 4321 *et seq.*, and FLPMA, 43 U.S.C. §§ 1701 *et seq.* Both district courts granted summary judgment in part for the plaintiffs. In the Montana suit, the court concluded that BLM's June 2018 Wyoming lease sale violated FLPMA because it failed to comply with the Prioritization Objective set out in the 2015 Plan. In the Idaho suit, the court concluded that five 2018 lease sales occurring in Nevada, Wyoming, and Utah violated the public participation requirements of NEPA and FLPMA. The district courts in both cases vacated the IMs and the lease sales. The BLM, U.S. Department of the Interior, the Secretary of the Interior, and the Montana Bureau of Land Management Deputy State Director (collectively, the "government"), along with Intervenor-Defendants the State of Wyoming, Western Energy Alliance, Chesapeake Exploration, LLC, and Anschutz Exploration Corporation (AEC), appeal the summary judgment orders.

The issues, as will appear, are complex. In the end, we largely affirm the district court decisions, with one major exception.

## I.   BACKGROUND

### A.  Factual and Regulatory Background

#### i.      Oil and Gas Leasing Under FLPMA

The Bureau of Land Management is a federal agency responsible for administering federal lands and subsurface mineral rights. The Mineral Leasing Act (MLA) authorizes BLM to offer leases for oil and gas extraction on public lands. 30 U.S.C. §§ 181 *et seq.* The Federal Land Policy and Management Act establishes requirements for the leasing process, including that the Bureau manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA further requires that the government "receive fair market value of the use of the public lands and their resources." *Id.* § 1701(a)(9).

The Bureau follows a three-step process for leasing and extraction on public lands. First, BLM adopts a Resource Management Plan (Plan) assessing the oil and gas resources in a broad geographic area and identifying areas of land open to development. 43 C.F.R. § 1601.0-5(n) (2017).[1] The Plan establishes, among other things, "[l]and areas for limited, restricted or exclusive use," "[a]llowable resource uses . . . and related levels of production or use to be maintained," "[r]esource condition goals and objectives to be attained,"

---

[1] The Center for Environmental Quality (CEQ) issued new NEPA regulations effective September 14, 2020, *see* 85 Fed. Reg. 43304 (July 16, 2020), and again as effective July 1, 2024, *see* 89 Fed. Reg. 35442 (May 1, 2024). Similarly, BLM promulgated new oil and gas leasing regulations in April 2024. 89 Fed. Reg. 30916 (Apr. 23, 2024). Except where otherwise noted, the citations here are to the version of the regulation in place at the time of the challenged action.

and "[p]rogram constraints and general management practices." *Id.*; *see also* 43 U.S.C. § 1712(a). FLPMA requires that BLM manage public lands "in accordance with the land use plans developed." 43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 1610.5-3(a) (2017) ("All future resource management authorizations and actions . . . shall conform to the approved plan.").

Second, once a Plan is adopted, if the Bureau has identified land available for oil and gas extraction, it is required to hold quarterly competitive lease sales. 30 U.S.C. § 226(b)(1)(A) (2014); 43 C.F.R. § 3120.1-2(a) (2016). The Bureau identifies parcels for sale, sometimes responding to expressions of interest (EOIs) from potential lessees, and sometimes selecting parcels on its own. 43 C.F.R. § 3120.1-1(e), (f) (1988). "Parcels which receive nominations shall be included in a Notice of Competitive Lease Sale;" only the Bureau may withdraw a nomination. *Id.* §§ 3120.3-4, 3120.3-5 (1988). A sale may be suspended while the Bureau considers a protest against a parcel's inclusion in the sale notice. *Id.* § 3120.1-3. Parcels are then auctioned off to the highest bidder. 30 U.S.C. § 226(b)(1)(A) (2014); 43 C.F.R. § 3120.5-1 (1988).

Third, after the land has been auctioned off, oil and gas operators submit drilling proposals to BLM. 30 U.S.C. § 226(g). To obtain a permit to drill, operators must submit a drilling plan and a surface use plan describing the anticipated drill-site construction, identifying potential hazards, and specifying mitigation or reclamation measures. 43 C.F.R. § 3162.3-1(e)–(f) (2017). No drilling operations or surface disturbance may occur until BLM approves a drilling permit. *Id.* § 3162.3-1(c). In approving drilling applications, the agency may impose modifications or conditions on the permit. *Id.* § 3162.3-1(h)(1).

ii.     NEPA Requirements

NEPA's "twin aims" are "plac[ing] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," and "ensur[ing] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citation and quotation marks omitted); *see also* 40 C.F.R. § 1500.1(b) (1978). Any agency undertaking a "major Federal action[] significantly affecting the quality of the human environment" must prepare an environmental impact statement (EIS). 42 U.S.C. § 4332(C) (1975). To determine whether an EIS is required, an agency may first prepare an Environmental Assessment (EA). 40 C.F.R. §§ 1501.3(a), 1501.4(c) (1978). If, after preparing the Assessment, an agency determines that the action "will not have a significant effect on the human environment," then the agency makes a "Finding of No Significant Impact," and need not prepare an EIS. *Id.* § 1508.13 (1978).

Under BLM regulations, the agency must prepare an EIS when adopting a Resource Management Plan. 43 C.F.R. § 1601.0-6 (1983). It must also prepare an Environmental Assessment "for all proposed Federal actions" not categorically excluded or "covered sufficiently by an earlier environmental document." *Id.* § 46.300(a) (2008). "When available," BLM "should use existing NEPA analyses for assessing the impacts of a proposed action and any alternatives." *Id.* § 46.120(a) (2008).

iii.    2015 Resource Management Plan Amendments

These appeals concern actions taken by BLM to protect the habitat of the greater sage-grouse. The greater sage-

grouse is a "ground-dwelling bird" dependent on the sagebrush steppe ecosystem of the western United States. Sage-grouse population numbers have declined to "less than ten percent of historic levels" as a result of habitat loss and fragmentation. The greater sage-grouse is considered an "umbrella species," meaning that protecting it also benefits other species dependent on the sagebrush habitat. According to the Bureau, the sagebrush steppe ecosystem is "widely recognized as one of the most imperiled ecosystems in North America." An estimated 350 wildlife species depend on it.

In 2010, the U.S. Fish and Wildlife Service determined that listing the greater sage-grouse as endangered or threatened under the Endangered Species Act was "warranted, but precluded by higher priority listing actions." 75 Fed. Reg. 13,910, 13,190 (Mar. 23, 2010).[2] The Bureau, along with the U.S. Forest Service, then undertook "an unprecedented effort to conserve Greater Sage-Grouse . . . habitat on public lands administered by the [Bureau]." The agencies amended 98 land use plans covering sage-grouse habitat in the western United States. The Plans designated land containing sage-grouse habitat in increasing levels of protection, starting with general habitat management areas, progressing to priority habitat management areas, and ending with sagebrush focal areas, "a subset of priority habitat most vital to the species persistence."

In the Record of Decision issued alongside the 2015 Plan amendments, the Bureau identified "[a]voiding or minimizing new and additional surface disturbances" as one of four "essential components" of its conservation strategy.

---

[2] A "warranted but precluded" finding is made where the Service has insufficient resources to undertake the listing process for a species in a given year. 75 Fed. Reg. 14,007.

Among the "habitat protection and surface disturbance measures" adopted was the following "Prioritization Objective":

> In addition to allocations that limit disturbance in [priority and general habitat management areas], the [Plans] prioritize oil and gas leasing and development outside of identified [habitat areas]. This is to further limit future surface disturbance and encourage new development in areas that would not conflict with [the greater sage-grouse]. This objective is intended to guide development to lower conflict areas and as such protect important habitat and reduce the time and cost associated with oil and gas leasing development by avoiding sensitive areas, reducing the complexity of environmental review and analysis of potential impacts on sensitive species, and decreasing the need for compensatory mitigation.

At issue in the Montana suit is the 2015 Resource Management Plan Amendment for Wyoming. The 2015 Plan declared the following "management goal": "Conserve, restore, and enhance sage-grouse habitat on a landscape scale consistent with local, state, and federal management plans and policies, as practical, while providing for multiple use of BLM-administered lands." Among 17 "management objectives" adopted to promote this goal was the following:

> Priority will be given to leasing and development of fluid mineral resources . . .

outside of [priority and general habitat areas]. When analyzing leasing and authorizing development of fluid mineral resources . . . in [priority and general habitat areas], and subject to applicable stipulations for the conservation of [the greater sage-grouse], priority will be given to development in non-habitat areas first and then in the least suitable habitat for [the greater sage-grouse].

Following the adoption of the 2015 Plan, the Fish and Wildlife Service concluded that listing of the sage-grouse was unnecessary because "the primary threats to greater sage-grouse have been ameliorated by conservation efforts implemented by Federal, State, and private landowners," including the Plans adopted and amended by BLM. 80 Fed. Reg. 59,858, 59,874–75, 59,891 (Oct. 2, 2015).

iv.    Instruction Memoranda

The claims in both the Montana and the Idaho suit concern changes BLM made to Instruction Memoranda describing the agency's procedures for oil and gas leasing.

Relevant to the Montana suit are Memoranda BLM adopted to implement the 2015 greater sage-grouse Plan amendments. In September 2016, BLM adopted one such memorandum, IM 2016-143, to carry out the Prioritization Objective (the decision to "prioritize oil and gas leasing and development outside of identified [sage-grouse habitat management areas]"). IM 2016-143 set forth a "prioritization sequence" to be applied when considering expressions of interest. The Memorandum instructed that lands outside of habitat management areas "should be the first priority for leasing in any given lease sale," followed by

lands within general habitat areas, and then lands within priority habitat areas. The Memorandum clarified that it did not prohibit leasing or development in sage-grouse habitat, nor did it require BLM "to wait for all lands outside [sage-grouse] habitat areas to be leased or developed before allowing leases within [habitat]."

In August 2017, Secretary of the Interior Ryan Zinke issued a memorandum expressing concerns over the implementation of the 2015 sage-grouse Plan amendments and directing the Bureau to "[m]odify or issue new policy on fluid mineral leasing and development, including the prioritization policy." In response, the Bureau issued IM 2018-026, which replaced IM 2016-143. The new Memorandum sought to "ensure consistency, certainty, and clarity when implementing" the Prioritization Objective, "while continuing to move forward expeditiously with oil and gas leasing and development, yet providing protections for [sage-grouse and sage-grouse habitat]." In place of the prioritization sequence in the earlier Memorandum, IM 2018-026 instructed that "*[w]here the BLM has a backlog* of Expressions of Interest for leasing, the BLM will prioritize its work first in non-habitat management areas, followed by lower priority habitat management areas (e.g., [general habitat management areas]) and then higher priority habitat management areas (i.e., [priority habitat management areas], then [sagebrush focal areas])." (emphasis added). It then stated that stipulations on lease development in protected areas could be used "to encourage lessees to acquire leases outside of" sage-grouse habitat. IM 2018-026 took effect "immediately."

Relevant to the Idaho suit, BLM also issued Instruction Memoranda related to public participation in the NEPA review process for oil and gas leasing. At the time the 2015

Plan amendments were adopted, IM 2010-117 stated that "the NEPA compliance documentation for oil and gas leasing *must* include an opportunity for public review." (emphasis added). There were two ways for the Bureau to satisfy this obligation. First, where "the proposed leasing action is adequately analyzed in an existing NEPA document,"—such as the one prepared during the adoption of the 2015 Plan—the agency was permitted to issue a "Determination of NEPA Adequacy." "Although not required by law or regulation," the IM stated that "field offices *will* provide a 30-day public review and comment period" before issuing such a Determination. (emphasis added). Second, if a Determination of NEPA Adequacy was not appropriate, the Bureau was required to conduct site-specific NEPA analysis, typically in the form of an Environmental Assessment "tiered" to the EIS conducted for the applicable Resource Management Plan. A 30-day comment period was also required by the Memorandum (but not "by law or regulation") for any Environmental Assessment or Finding of No Significant Impact. Finally, after the NEPA process was complete, IM 2010-117 required the Bureau to post a final sale notice, with NEPA compliance information attached, at least 90 days before the lease sale date. The agency was then required to hold a 30-day protest period, beginning on the day the sale notice was posted.

In January 2018, the Bureau issued IM 2018-034, which superseded IM 2010-117 and "replace[d] any conflicting guidance or directive found in the BLM Manual or Handbook." IM 2018-034 "sets out the policy of [BLM] to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are consistently held." The new Instruction

Memorandum made provision for NEPA participation optional, stating that "[s]tate and field offices *may* provide for public participation during the NEPA process."[3] (emphasis added). The new Memorandum further specified that, where the Bureau confirmed that the leasing action was adequately analyzed in existing NEPA documentation, a Determination of NEPA Adequacy "will be used to document NEPA compliance" and "no further public comment period is required." Where such a Determination was insufficient, the new Memorandum stated, BLM "*can* prepare" an EA or EIS. (emphasis added). The new Memorandum also halved the public notice period for lease sales to 45 days and shortened the public protest period to 10 days.

In April 2021, one week before the initial oral argument in the *Western Watersheds* appeal, BLM issued IM 2021-027, which superseded certain provisions of IM 2018-034.[4] The new Memorandum reinstated the mandatory 30-day NEPA public review and comment period for Determinations of NEPA Adequacy, Environmental Assessments, and Findings of No Significant Impact, and the 30-day protest period and eliminated the six-month internal review timeframe. IM 2021-027 retained from IM 2018-034 the 45-day lease sale notice.

---

[3] As we will explain, *see infra* pp. 29–32, BLM did ultimately provide for some participation—15 days, half as much as was required under the 2016 IM.

[4] After the initial argument on May 6, 2021, we withdrew submission because there were separate appeals on the intervention issues. *See infra* pp. 33–34, 36. After the intervention issues were resolved in this court and the district courts and the intervenors appealed, we held a second oral argument on September 29, 2023.

v.    Lease Sales

In June and September 2018, the Bureau conducted five lease sales in Wyoming, Nevada, and Utah, resulting in a total of 677 leases on 900,070 acres of land. Only the June 2018 Wyoming sale is at issue in *Montana Wildlife Federation*, while all five lease sales are challenged in *Western Watersheds*.

1.    June 2018 Wyoming Sale

For its June 2018 lease sale in Wyoming, BLM received expressions of interest for 178 parcels. It did not designate any parcel for sale on its own. The Bureau's Wyoming office prepared a draft Environmental Assessment for the parcels and provided for a 30-day comment period.

After considering public input, the agency concluded that 19 of the parcels should not be sold, for reasons primarily unrelated to sage-grouse conservation. One whole parcel and portions of three others were "deferred," or held over for consideration at the next sale, because they were in areas that Wyoming (but not BLM) had designated as "core" sage-grouse habitat. BLM was required by its own policies to defer leasing such parcels until the applicable Plan was updated to align with the state's designation. The remaining parcels were either partially or entirely within federally designated sage-grouse management areas.

The Bureau issued a Finding of No Significant Impact. It then noticed the sale of 162 parcels with a 10-day protest period. There were three protests, collectively covering all parcels listed for sale, on the ground that the agency had failed to apply the Prioritization Objective. The Bureau responded that it "was able to adjudicate all the [Expressions of Interest] it had received." And because IM 2018-026

required that it prioritize leasing in non-habitat management areas only "where BLM has a backlog of [Expressions of Interest]," the protesters had "not shown how the BLM has not complied with the provisions of the [2015 Plan], as interpreted by policy."

The Bureau eventually sold 158 Wyoming parcels, covering over 192,000 acres. The sale yielded nearly $36 million, half of which the Bureau disbursed to Wyoming under 30 U.S.C. § 191.[5]

### 2.  September 2018 Wyoming sale

In January 2018, the Bureau circulated two draft Environmental Assessments—each with 30-day comment periods—covering 124 parcels to be sold at its September 2018 sale in Wyoming. After IM 2018-034 issued on January 31, 2018, BLM identified an additional 254 parcels for sale. As the Bureau reviewed the second set of parcels "under [IM 2018-034's] requirements," it offered a public comment period on the Environmental Assessment for the additional parcels of only 14 days.

After considering the submitted comments, the Bureau issued a Finding of No Significant Impact. It then noticed a lease sale of 350 parcels, with a 10-day protest period. The agency received three protests. It then offered for sale 348 parcels and received competitive bids on 311, totaling 301,605 acres and resulting in more than $60 million in revenue, to be shared between the federal government and Wyoming.

---

[5] Under the Mineral Leasing Act, fifty percent of the funds received from the lease of public lands is distributed to the state in which the land is located.

### 3.  June 2018 Nevada Sale

For its June 2018 sale in Nevada, BLM circulated a draft Environmental Assessment with a 30-day comment period covering 166 parcels. It later issued a Finding of No Significant Impact, and noticed 166 parcels for sale, with a 10-day protest period. BLM received only 22 bids, totaling 38,579 acres and resulting in around $200,000 in revenue.

### 4.  September 2018 Nevada Sale

For its September 2018 sale in Nevada, the Bureau identified 144 parcels for sale. The agency prepared two Determinations of NEPA Adequacy, relying on the draft EAs prepared for adjacent parcels in previous years. The Determinations concluded that "[p]ublic involvement for the [Plan] and the three Lease Sale [Environmental Assessments] was adequate for the current Proposed Action." The Assessments adopted for the earlier lease sales had been subject to 30-day comment periods or longer scoping periods.[6]

BLM then noticed 144 parcels for sale with a 10-day protest period, resulting in two protests. It eventually offered all 144 parcels for sale. None of the parcels received bids, but the agency sold 12 parcels totaling around 27,000 acres noncompetitively.

---

[6] "Scoping is a process that continues throughout the planning and early stages of preparation of an environmental impact statement. Scoping is required for an environmental impact statement; scoping may be helpful during preparation of an environmental assessment, but is not required." 43 C.F.R. § 46.235(a).

### 5.  September 2018 Utah Sale

For the September 2018 sale in Utah, the Bureau circulated draft Environmental Assessments covering 109 parcels. The Assessment for 33 of the parcels had a 15-day comment period, while the Assessment for the other 76 parcels involved a 15-day scoping period. BLM then noticed 109 parcels with a 10-day protest period, yielding two protests. BLM eventually offered all 109 parcels for sale, resulting in 69 bids for parcels, totaling 133,922 acres and yielding $3,311,829 in revenue.

## B.  Procedural Background

### i.  Montana Litigation (*Montana Wildlife Federation*)

In April 2018, Montana Wildlife Federation, The Wilderness Society, National Audubon Society, and National Wildlife Federation (collectively, "the Federation") filed suit against the government in the district court for the District of Montana under the APA. The complaint, amended in June 2018, raised the following claims for relief as relevant here: First, it alleged that the Zinke Memorandum and IM 2018-026, as well as the application of IM 2016-143 to the lease sales, did not conform to the Prioritization Objective in the 2015 Plan, and so violated FLPMA and the APA. Second, it alleged that the Montana, Nevada, and Wyoming lease sales were inconsistent with the Prioritization Objective, and therefore violated FLPMA and the APA.

Given the number of issues, the parties agreed to litigate the case in phases. Phase One addressed the challenges to IM 2018-026 and the June 2018 Wyoming lease sale. The state of Wyoming and the Western Energy Alliance, an oil and gas

industry association, intervened as defendants and participated in Phase One.

The Montana district court granted summary judgment on the Phase One claims in favor of the plaintiffs on May 22, 2020. The court held, first, that IM 2018-026, but not the Zinke Memorandum, was a final agency action subject to challenge under the APA. Second, the court held that IM 2018-026 violated FLPMA because it was inconsistent with the Prioritization Objective contained in the 2015 Plan. Third, the court held that the June 2018 Wyoming lease sale and four other lease sales violated FLPMA. As to the proper remedy for the violations it found, the district court stated in its memorandum that it would "follow the normal procedure in the Ninth Circuit and vacate the 2018 IM and the lease sales in their entirety except for the portion of the Butte parcels that did not cover sage-grouse habitat." The order issued granted in part the Federation's motion for summary judgment, stating that "Plaintiffs' claims that the 2018 IM and lease sales violated FLPMA are granted."

On July 2, 2020, Anschutz Exploration Co. (AEC), the holder of certain leases purchased in the June 2018 Wyoming sale, moved to intervene "only for purposes of participating in an appeal of the Court's order." The government, Wyoming, and the Alliance filed notices of appeal of the summary judgment order and moved in the district court to stay "the aspect of the Order vacating the leasing decision and the [June 2018 Wyoming] leases." The district court granted the motions, "stay[ing] the vacatur of the Wyoming leasing decision and associated leases and suspend[ing] any operation or production related to those leases." AEC filed a notice of appeal of the Phase One decision while its motion to intervene was pending.

The district court denied AEC's motion to intervene on August 24, 2020; AEC appealed that ruling. On January 5, 2022, a different panel of this court (the "Intervention Panel") reversed the district court's denial of the motion to intervene, concluding that AEC was entitled to intervention as of right under Rule 24(a). *Mont. Wildlife Fed. v. Haaland*, No. 20-35793, 2022 WL 42794 (9th Cir. Jan. 5, 2022). The Montana district court then entered an order granting AEC's motion to intervene in the Phase One summary judgment appeal, and AEC filed a second notice of appeal of the Phase One summary judgment order.

ii.     Idaho litigation (*Western Watersheds Project*)

In April 2018, plaintiffs Western Watersheds Project and Center for Biological Diversity (collectively, Western Watersheds) filed suit in the district court for the District of Idaho against the Secretary of Interior, Deputy Secretary of Interior, and BLM. The complaint challenged the adoption of two IMs and eight lease sales, none of which were in Idaho. The government moved pursuant to Federal Rule of Civil Procedure 21 and 28 U.S.C. § 1404(a) to sever and transfer the lease sale claims to the states in which the parcels were located, and to transfer the claims directed at the IMs to the District of Columbia. The Alliance and Wyoming intervened and filed briefs in support of the government's transfer motion, which the court eventually denied.

On the merits, the court granted in part plaintiffs' motion for a preliminary injunction, "enjoining" certain provisions of IM 2018-034 and replacing them with corresponding provisions in IM 2010-117, to take effect beginning with the December 2018 lease sales. Western Watersheds then amended the complaint to challenge the June and September 2018 lease sales in Wyoming, Utah, and Nevada that took

place after the initial complaint was filed (and after IM 2018-034 took effect). As here pertinent, the complaint alleged: that the lease sales violated FLPMA, NEPA, and the APA, and that the adoption of actions taken to implement IM 2018-034 violated FLPMA and NEPA.

The parties, as in Montana, agreed to litigate in phases, with Phase One concerning the challenges to IM 2018-034 and the five lease sales that took place in June and September 2018. The district court granted summary judgment to the plaintiffs with regard to the Phase One issues, concluding that the challenged provisions of IM 2018-034, addressing public participation, protest periods, and parcel review, were substantively and procedurally invalid under FLPMA, NEPA, and the APA. The court then held that the June and September 2018 lease sales in Nevada, Utah, and Wyoming violated the public participation requirements of NEPA and FLPMA. The court ordered that the relevant provisions of IM 2018-034 be "enjoined" and "set aside" and replaced with the corresponding provisions of IM 2010-117 "[f]or all succeeding oil and gas lease sales" in sage-grouse habitat, until BLM completes notice-and-comment rulemaking on a replacement Memorandum. The order further "set aside" the Phase One lease sales.

The government, Wyoming, and the Alliance appealed the Phase One order. The district court later issued an order denying the plaintiffs' motion for reconsideration and clarification of the Phase One remedies. In that order, the court granted in part the motions filed by the government, Wyoming, and the Alliance to stay the "portion of the [Phase One Order] that sets aside the Phase One lease sales," and "order[ed] the suspension of operations and production of the Phase One lease sales pending the appeal."

After the summary judgment issued, AEC and another owner of leases purchased during the challenged sales, Chesapeake Exploration, LLC, moved to intervene pursuant to Federal Rules of Civil Procedure 19 and 24 for purposes of appealing the Phase One summary judgment order and participating in subsequent phases of the case in district court.[7] The Idaho district court denied the motions. The Intervention Panel reversed that intervention decision, as well, again on Rule 24 grounds. *W. Watersheds Project v. Haaland*, 22 F.4th 828 (9th Cir. 2022) (Chesapeake); *W. Watersheds Project v. Haaland*, No. 20-35693, 2022 WL 42787 (9th Cir. Jan. 5, 2022) (AEC).

On remand, the Idaho district court granted Chesapeake and AEC's motions to intervene "in both the Phase One appeal and in future phases of litigation in which their leases are implicated." AEC and Chesapeake filed notices of appeal from the Phase One summary judgment order on July 1, 2022.

## II.  JURISDICTION

We first address whether we have jurisdiction over the appeals.

### A.  The Phase One Summary Judgment Orders

Western Watersheds and the Federation allege that the Court lacks jurisdiction over the Phase One summary

---

[7] Chesapeake sought to intervene as of right under Rule 24(a), permissively under Rule 24(b), or "in the alternative, solely for purposes of appeal." AEC sought to intervene "not only to participate in the upcoming interlocutory appeal to the Ninth Circuit but also to protect its interests during Phase Two."

judgment orders because they are non-final, non-injunctive, interlocutory orders.

Appellate jurisdiction is generally limited to "final decisions of the district courts of the United States." 28 U.S.C. § 1291. "An order granting partial summary judgment is usually not an appealable final order under 28 U.S.C. § 1291 because it does not dispose of all of the claims." *Am. States Ins. Co. v. Dastar Corp.*, 318 F.3d 881, 884 (9th Cir. 2003). But 28 U.S.C. § 1292(a)(1) provides that a court of appeals has jurisdiction over appeals from "[i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court."

"In determining the appealability of an interlocutory order under 28 U.S.C. § 1292(a)(1), we look to its substantial effect rather than its terminology." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1165 (9th Cir. 2012) (quoting *Armstrong v. Wilson*, 124 F.3d 1019, 1021 (9th Cir. 1997)). So whether an order is labeled as an "injunction is not dispositive." *Id.* What does matter is whether the order "prescribes conduct" and "compels compliance." *Thompson v. Enomoto*, 815 F.2d 1323, 1326 (9th Cir. 1987).

More specifically, an appellate court has jurisdiction under § 1292(a)(1) over district court orders that "(1) have the practical effect of entering an injunction, (2) have serious, perhaps irreparable, consequences, and (3) [are] such that an immediate appeal is the only effective way to challenge it." *Calderon v. United States Dist. Court for the Cent. Dist. of Cal.*, 137 F.3d 1420, 1422 n.2 (9th Cir. 1998)

(citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981)). In assessing the "practical effect" of an order, we evaluate whether it is: "directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint in more than temporary fashion." *Gon v. First State Ins. Co.*, 871 F.2d 863, 865 (9th Cir. 1989) (citing 16 Charles A. Wright et al., Fed. Prac. & Proc. Juris. § 3922 (1977)) (footnote omitted).

To repeat for clarity, the two district court actions at issue here are: (1) the Phase One summary judgment order by the Montana district court in *Montana Wildlife Federation*; and (2) the Phase One summary judgment order by the Idaho district court in *Western Watersheds*. We address each in turn.

i.    *Montana Wildlife Federation* Phase One Order

In their brief in support of Phase One summary judgment in the Montana case, the plaintiffs requested that the district court "declare invalid and set aside" both "the decisions authorizing the December 2017 Montana lease sale, the March 2018 Montana sale, and the June 2018 Wyoming sale," and "all leases issued in connection with those sales." The Montana Phase One Order stated that the "Plaintiffs' Motion for Summary Judgment . . . is GRANTED, IN PART. Plaintiffs' claims that the 2018 IM and lease sales violated FLPMA are granted." The order itself does not specify what further action it prescribes. But in its memorandum of decision, which immediately preceded the order, the district court stated that it was "vacat[ing] the 2018 IM and the lease sales in their entirety except for the portion

of the Butte parcels that did not cover sage-grouse habitat."**[8]**
So, in context, the remedy ordered has two components: the
vacatur of IM 2018-026 and the vacatur of the lease sales.
Both components of the court's decision are at issue in this
appeal.

Under our precedents, vacatur of IM 2018-026 does not
have the practical effect of an injunction. *Alsea Valley
Alliance v. Department of Commerce* held that we lack
jurisdiction over an order declaring an agency action
unlawful where the order requires no additional action by the
party to which it is directed. 358 F.3d 1181, 1186–87 (9th
Cir. 2004).

*Alsea Valley* addressed a district court order vacating an
agency's endangered species listing decision. *Id.* at 1183.
The order in *Alsea Valle*y remanded to the agency "for
further consideration," and prohibited the agency from

---

[8] The district court reviewed the lease sales and IM under the
Administrative Procedure Act, which permits a court to "set aside agency
action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In his
concurring opinion in *Corner Post, Inc. v. Board of Governors of the
Federal Reserve System*, Justice Kavanaugh addressed a "far-reaching
argument," advanced by the federal government in certain cases and
advocated for in legal academic literature, "that the APA does not allow
vacatur," but instead only authorizes the court "to enjoin an agency from
enforcing a rule against the plaintiff" in a particular case. 144 S. Ct. 2440,
2460–61 (2024) (Kavanaugh, J., concurring). Justice Kavanaugh
concluded, based upon the text and history of the APA, longstanding
precedent, and the "radical consequences . . . that would ensue" if the
Court were to hold otherwise, that the APA authorizes vacatur of
unlawful agency actions. *Id.* at 2462. Specifically, he noted that the "APA
incorporated [the] common and contemporaneous meaning of 'set
aside'" when it was enacted, which includes vacatur. *Id.* We agree with
Justice Kavanaugh's analysis and accordingly treat the district courts'
use of "set aside" and "vacate" as equivalent.

enforcing the rule as-is; it did not specifically compel any other action by the agency. *Id.* at 1183, 1186. *Alsea Valley* held that the challenged order did not have the "practical effect" of an injunction. *Id.* at 1186–87. Characterizing such relief as injunctive, according to the court, "would be contrary to [the] important principle" that relief under § 1292(a)(1) is "a limited exception to the final-judgment rule" that we "construe[] . . . narrowly." *Id.* at 1186 (quoting *Orange Cnty v. Hongkong & Shanghai Banking Corp.*, 52 F.3d 821, 825 (9th Cir. 1995)).

In contrast, we have exercised jurisdiction over the vacatur and remand of a rule where the district court includes "specific provisions" prohibiting and ordering actions beyond the reinstatement of the earlier rule. In *Turtle Island Restoration Network v. U.S. Department of Commerce*, the district court entered a consent decree vacating a fisheries regulation increasing the "take" limit—meaning incidental interactions with fishing boats—for sea turtles. 672 F.3d 1160, 1162 (9th Cir. 2012). We acknowledged that the earlier regulation would be automatically reinstated upon remand, a fact the plaintiffs argued weighed against considering it an injunction. *Id.* at 1165. Nevertheless, we concluded that the remand order was injunctive in effect because it prohibited increases to the take limit absent specified procedures and compelled the agency to issue a new take regulation within a specified time frame. *Id.*

The vacatur of IM 2018-026 is more like the vacatur of the agency rule in *Alsea Valley* than the remand order in *Turtle Island*. In *Alsea Valley*, the district court concluded only that the rule was "declared unlawful and set aside as arbitrary and capricious." *Alsea Valley All. v. Evans*, 161 F. Supp. 2d 1154, 1163–64 (D. Or. 2001). Here, the district court concluded that the "2018 IM violates the FLPMA" and

"vacate[d]" it. The Montana order did not instruct the government to replace provisions of IM 2018-026 or to issue another IM in place of the one it vacated. Instead, the only action required of the government with respect to IM 2018-026 is that the agency refrain from enforcing it in future lease sales.[9]

Accordingly, the component of the district court's order vacating IM 2018-026 is not injunctive in nature, and we lack jurisdiction to review it.

The district court's vacatur of the lease sales, however, did require further action by the government. In considering the appropriate remedy for the FLPMA violation, the district court determined that, following vacatur, "the Government and states will need to return millions of dollars to the interested parties who won lease sales." That the district court anticipated that vacatur of the lease sales would require further action by the government is clear not only from its memorandum of decision ending with the remand order but also from its order granting a stay of the vacatur. There, the court stated that "[s]etting aside or cancelling leases would require the [government] to recover funds paid to Wyoming and the lessees." The parties, too, understood that the vacatur order would require action by the government. In support of

---

[9] The logic of the *Alsea Valley* decision has been called roundly into question in a recent case. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 69 F.4th 588, 596–97 (9th Cir. 2023) (Friedland, J. joined by Bennett, J., concurring).  The *Center for Biological Diversity* concurrence calls for en banc consideration of the propriety of *Alsea Valley*'s holding concerning the reach of § 1292(a)(1) in cases concerning agency orders. The *Center for Biological Diversity* concurrence, in our view, is compelling as to why *Alsea Valley* was wrongly decided and should be reconsidered.

its motion for stay, the government declared that, to carry out the district court's order, BLM would need to issue decisions of cancellation identifying the amount to be refunded to the leaseholders, and a separate office of the Department of the Interior would need to negotiate agreements to recoup monies distributed to the states. Montana Wildlife also acknowledged that vacatur would require the government to refund $36 million to lessees and recoup $17.6 million distributed to Wyoming.

Accordingly, both the district court and the parties understood that the order vacating the lease sales required additional action by the government and "compel[led] compliance." *Thompson v. Enomoto*, 815 F.2d 1323, 1326 (9th Cir. 1987). The order's "substantial effect" was to require, in addition to vacatur of the leases, their formal cancellation, the return of the sale proceeds to the lessees and recoupment from Wyoming of distributed funds. *Turtle Island Restoration Network*, 672 F.3d at 1165.

Further, the government would face sanctions under Fed. R. Civ. P. 70(a) and (e) if it failed to carry out these actions. Fed. R. Civ. P. 70(a) provides that "[i]f a judgment requires a party to convey land, to deliver a deed or other document, or to perform any other specific act," the court may take various actions to enforce the judgment, including by holding the disobedient party in contempt. "Civil contempt in this context consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Given its recognition that its order required the government to cancel the leases and refund the lessee's funds, the district court would not need to sit idly by if the

government failed to take the requisite actions to carry out the court order.

Finally, the vacatur of the leases will have serious consequences, at least in the short run. *Calderon*, 137 F.3d at 1422 n.2. The government and Wyoming will have to return millions of dollars in funding derived from the lease sales. As to the leaseholders represented by the Alliance, they will have their leases cancelled and lose the opportunity to drill for oil and gas on the leased property while the lease vacatur is in effect. Those consequences are "such that an immediate appeal is the only effective way to challenge [them]." *Id.*

In sum, because *Alsea Valley* requires that we hold that the vacatur of IM 2018-026 was not injunctive, the court lacks jurisdiction as to that component of the district court's decision.[10] As the practical effect of the vacatur of the lease sales was to require the government at minimum to cancel the leases, return money to the lessees, and recoup funds distributed to Wyoming, that order was injunctive in nature and appealable under 28 U.S.C. § 1292(a)(1).

### ii. *Western Watersheds* Phase One Order

The Idaho district court in *Western Watersheds* determined that IM 2018-034 was substantively invalid because it failed to comply with the public participation requirements under FLPMA and NEPA. The court ordered that the challenged provisions of IM 2018-034 be replaced with the corresponding provisions of IM 2010-117 until

---

[10] Specifically, we lack jurisdiction to consider Wyoming's argument that the district court erred in vacating the memorandum and the Alliance's argument that the district court erred in concluding that the issuance of the memorandum was a final agency action.

BLM conducted proper notice-and-comment rulemaking. On April 30, 2021, the government issued IM 2021-027, superseding the identified provisions of IM 2018-034 and replacing them with the "corresponding provisions" of IM 2010-117. As the government recognizes, the "adoption of IM 2021-027 moots any dispute as to the lawfulness of the 2018 IM." Wyoming and the Federation agreed at oral argument that the issuance of IM 2021-027 mooted the appeal of the portion of the Idaho district court's order setting aside the public participation provisions of IM 2018-034. We therefore need not determine whether the component of the district court's order replacing provisions of IM 2018-034 is injunctive.

As to the lease sales, the Idaho district court Order stated that "[t]he Phase One lease sales applying IM 2018-034—the June and September 2018 lease sales in Nevada, Utah, and Wyoming—are set aside."[11] In describing the consequences of its vacatur remedy, the Idaho district court stated that "the lease rights will be terminated and BLM [will] be required to return over $125 million to the lessees." Later, in issuing the stay order, the court noted that "in the absence of a stay pending appeal, the leases will be set aside/cancelled" and "approximately $100 million would need to be returned." The contemplated effect of the court's decision was thus to require the government to cancel the leases and return funds from the sale. So, like the Montana court, the Idaho district court required further action by the government once its vacatur takes effect.

Western Watersheds asserts that the government could pursue various courses of action regarding the return of the

---

[11] The Idaho district court used the terms "set aside" and "vacate" interchangeably.

lease proceeds—including waiting for the lessees to seek restitution in the Court of Federal Claims or treating the money collected as credits against future lease sales—without being subject to a contempt motion in district court. But the relevant question is not whether the plaintiffs have avenues of relief available to them other than seeking an immediate contempt order. The question is whether the government is required to return the funds in some fashion, such that the court could hold it in contempt if it declined to do so. *Orange Cnty. v. Hongkong & Shanghai Banking Corp.*, 52 F.3d 821, 826 (9th Cir. 1995). That is the case here.

We therefore conclude that the Idaho order has "the practical effect of entering an injunction." *Calderon*, 137 F.3d at 1422 n.2. Like the Montana order, the vacatur of the lease sales under the Idaho order will "have serious, perhaps irreparable, consequences, . . . such that an immediate appeal is the only effective way to challenge it." *Id.*

Accordingly, we have jurisdiction to review the Idaho Phase One order under 28 U.S.C. § 1292(a)(1).

## B.  The Venue Order in Western Watersheds

The government and the Alliance challenge the Idaho district court's order denying the motion to sever and transfer claims raised in the initial complaint. That order addressed claims challenging lease sales other than the Phase One lease sales at issue in this appeal.

Section § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." The grant or denial of motions to transfer venue is discretionary, so

review is for abuse of discretion. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842 (9th Cir. 1986). Orders granting or denying a motion to transfer venue under § 1404(a) are "interlocutory in nature and are not appealable prior to final judgment." *Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 951 (9th Cir. 1968). *See also* Charles Alan Wright & Arthur R. Miller, 15 Fed. Prac. & Proc. Juris. § 3855 (4th ed.).[12]

The government and the Alliance contend that the Court should exercise pendent jurisdiction over their appeals of the transfer order. We may exercise pendent jurisdiction over an "otherwise non-appealable ruling [that] is 'inextricably intertwined' with or 'necessary to ensure meaningful review of' the order properly before us on interlocutory appeal." *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1134 (9th Cir. 2005) (quoting *Meredith v. Oregon*, 321 F.3d 807, 813 (9th Cir. 2003)).

The district court's order denying the motion to transfer is not "inextricably intertwined" with the Phase One order. The transfer order addressed claims challenging lease sales not addressed in the Phase One order.[13] Determining whether the district court abused its discretion in declining to transfer those claims under 28 U.S.C. § 1404(a) is not intertwined with or necessary to resolving whether the Phase

---

[12] We have at times treated an appeal of a denial of a transfer motion as a petition for mandamus. *Kasey v. Molybdenum Corp. of Am.*, 408 F.2d 16, 18 (9th Cir. 1969). No party requests that we do so here.

[13] The government maintains that the district court's ruling on the motion to transfer applies equally to the Phase One claims, because the leases were "indistinguishable." We may assume that is true. We still lack jurisdiction over a non-final transfer order for the reasons surveyed in the text.

One injunction order was erroneous on its merits. *Id.* Nor is review of the transfer decision necessary to assure ourselves of the district court's "authority to rule" on the issues before us. *Id.* (quoting *Meredith*, 321 F.3d at 816); *see also Puente Arizona v. Arpaio*, 821 F.3d 1098, 1110 (9th Cir. 2016) (identifying jurisdictional issues and certain immunities as implicating the court's authority to hear a suit).[14] "Venue is largely a matter of litigational convenience . . . ." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006). That is particularly so as to a § 1404(a) transfer motion, which does not require an assertion that venue is improper in the district court where the case was filed. The resolution of the § 1404(a) transfer motion therefore did not affect the district court's power to hear the challenges, brought under the APA, NEPA, and FLPMA, to a set of lease sales. Accordingly, we do not have pendent jurisdiction over the appeals of the transfer order.

The Alliance and the government relatedly argue that venue was improper in Idaho for the Phase One lease sale claims because the claims "involve" real property. A civil action involving a federal officer or agency may be brought "in any judicial district in which . . . the plaintiff resides *if no real property is involved in the action*." 28 U.S.C. § 1391(e)(1) (emphasis added). No party moved to dismiss the Phase One lease-sale claims for improper venue under

---

[14] *Hendricks* exercised pendent jurisdiction to review a venue defense "under the particular circumstances of [the] interlocutory appeal." 408 F.3d at 1135. But that case addressed the grant of a motion to dismiss for improper venue under Fed. R. Civ. P. 12(b)(3), where the district court had concluded that a forum selection clause precluded the action. *Id.* at 1132. The order at issue here denied a discretionary motion to transfer under § 1404(a).

Federal Rule of Civil Procedure 12(b)(3), or to transfer the claims under 28 U.S.C. § 1406(a).

The government and the Alliance maintain that we should nonetheless reach the question whether the real property exception to venue in a case against the federal government applies here. They argue that raising an improper venue argument with respect to the Phase One lease sales would have been futile because the court had already rejected that argument with respect to the 2017 lease sale claims. Specifically, they point to a footnote in the district court's transfer order in which it rejected the argument, raised by the Alliance in a surreply, that venue was improper in Idaho under 28 U.S.C. § 1391(e) because the leases involved real property interests.

That argument is unpersuasive. For one thing, district courts may, and often do, reconsider earlier rulings as litigation proceeds. *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018); *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001); Fed. R. Civ. P. 54(b). The government, in fact, did raise a real property venue issue, after the district court's ruling on the motion to transfer, with regard to a different government action.[15]

More importantly, the only relevant venue motions the government and Alliance ever made were for discretionary transfer of venue, not for dismissal or transfer for lack of venue. At the time the possibly relevant motion for transfer was made in 2017, the district court had not yet considered

---

[15] After the First Amended Complaint was filed, the government filed a motion to dismiss for improper venue under Rule 12(b)(3) with respect to a single natural gas development project not at issue here.

the question whether the challenges here involve real property rights as an argument favoring discretionary transfer. But it did consider that question in its order on the discretionary transfer motion, rejecting the real property argument as a basis for discretionary transfer.

As we have explained, review of the denial of that motion does not concern the authority of the district court to proceed and so is not properly before us on interlocutory review of an injunctive order. The same would have been true of a second § 1404(a) motion to transfer venue with regard to the additional lease sales. And in any event, we are acceding to the government's view that we should consider the earlier transfer motion as dispositive of whether the challenges to the later lease sales would have been transferred. *See supra* p. 46 n.13.

As to dismissal for lack of venue, as opposed to for discretionary transfer, no motion for dismissal due to improper venue—a nonjurisdictional matter—was ever made or denied with regard to the claims here at issue. So there is no relevant order over which we could exercise pendant jurisdiction. *See also* Fed. R. Civ. P. 12(g)(2), 12(h)(1).

In sum, we lack jurisdiction over the Idaho district court's order denying the motion to transfer the 2017 lease-sale claims.

## C. The Intervenor Claims

We next consider whether we have jurisdiction over the appeals of the Idaho Phase One order by Defendant-Intervenors Chesapeake and AEC.

For cases involving the federal government, notice of an appeal must be given within 60 days of the district court's

decision. 28 U.S.C. § 2107; Fed. R. App. P. 4(a)(1)(B). Prospective intervenors are subject to the same 60-day time limit as parties, even while their motions to intervene are pending. *Evans v. Synopsys, Inc.*, 34 F.4th 762, 770 (9th Cir. 2022). A motion to intervene alone is not construed as a motion to extend the deadline. *Id.* at 772–73.

The district court entered its Phase One partial summary judgment order on February 27, 2020. AEC did not move to extend the time to appeal under Rule 4, but did file a notice appealing the Phase One order on April 16, 2020, within 60 days of the Phase One order but before its motion to intervene was denied on July 24, 2020. Under *Evans v. Synopsys, Inc.*, for an appeal of a judgment to be timely, a prospective intervenor "must have *either* extended its time to file a notice of appeal *or* filed a notice of appeal by the statutory deadline." *Id.* at 770 (emphasis added).

As *Evans* pointed out, § 2107(a) provides that "no appeal shall bring any judgment, order or decree in an action . . . before a court of appeals for review unless notice of appeal is filed, . . ." without specifying who may bring the appeal or file the notice. *Id.* at 768 (quoting 28 U.S.C. § 2107(a)). In reading § 2107 to impose the same appeal deadline upon parties and prospective intervenors alike, 34 F.4th at 770, *Evans* assumed that both parties and prospective intervenors may file a notice of appeal. We hold that AEC's notice of appeal, filed within 60 days of judgment but before its intervention motion was denied, was timely.

Chesapeake, for its part, did not file a motion to extend the time for filing an appeal and filed a notice of appeal on May 29, 2020, outside of the 60-day window. Chesapeake filed an additional notice of appeal of the Phase One order on July 1, 2022, after it had been granted intervenor status.

As *Evans* made clear, notices of appeal filed after the 60-day deadline, where the parties have taken no action to extend the deadline, are untimely. 34 F.4th at 770. Accordingly, the court lacks jurisdiction over Chesapeake's appeal.

### D.  Standing

There is yet one more preliminary matter to address, before we get to the merits: whether plaintiffs have standing to challenge the government's actions.[16]

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing to sue, "a plaintiff must show: (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000). We review issues of standing de novo, absent factual disputes. *B.C. by & Through Powers v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999).

"To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d

---

[16] This argument was raised by Chesapeake, whom we have determined did not file a timely appeal. The Court nevertheless addresses the issue of standing, to assure itself of its jurisdiction. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

961, 969 (9th Cir. 2003) (quoting *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1015 (9th Cir. 2003)), *rev'd on other grounds*, 541 U.S. 752 (2004). Violations of the public participation provisions of NEPA may form the basis of standing. *Id.* at 971. So may "environmental and aesthetic injuries." *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176 (9th Cir. 2000) (collecting cases in which the diminished opportunity for the plaintiffs to observe or study an animal species provided the basis for standing).

For procedural claims, a "concrete interest" requires a "geographic nexus between the individual asserting the claim and the location suffering an environmental impact." *Citizens for Better Forestry*, 341 F.3d at 971 & n.6 (quoting *Pub. Citizen*, 316 F.3d at 971). Western Watersheds and the Federation have shown that their members use and enjoy some areas affected by the challenged lease sales.

True, the injury they allege is tied to the agency's method of administering lease sales across several states. But our caselaw does not require plaintiffs to show harm tied to each parcel on which a lease was granted. *Alaska Center for the Environment v. Browner* held that the plaintiff's showing of injury related to some, but not all, waterways was sufficient to establish standing to challenge EPA's compliance with the Clean Water Act with regard to a policy that applied to all Alaskan waterways. 20 F.3d 981, 985 (9th Cir. 1994). Likewise, *WildEarth Guardians v. U.S. Department of Agriculture* concluded that the plaintiff organization had standing to challenge an EIS applicable to some regions for which the organization did not provide member declarations. 795 F.3d 1148, 1155 (9th Cir. 2015). And *Western Watersheds Project v. Kraayenbrink* determined that the plaintiffs had standing to challenge amendments to BLM's grazing regulations based on harm to some of the land

allotments to which the regulations applied. 632 F.3d 472, 484–86 (9th Cir. 2011). Accordingly, Western Watersheds and the Federation have established an injury-in-fact sufficient to support standing. They challenge broadly applicable BLM policies that cover some areas their members use and enjoy, resulting in lease sales in various locations.

Once an injury-in-fact is established for a procedural claim, the redressability and causation requirements are "relaxed." *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1083 (9th Cir. 2015). The plaintiffs "need not show that [redoing the lease sale] would lead to a different result at either the programmatic or project-specific level." *Id.* Instead, they must show only that the agency's decision "*could be influenced*" by the requested procedural change. *Pub. Citizen*, 316 F.3d at 1019 (quoting *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001)). Plaintiffs have adequately shown that the government might have offered different parcels for sale, or a different number of parcels, if they had adequately implemented the Prioritization Objective or sought additional public input on the lease sales. Accordingly, plaintiffs have established that remand to the agency to redo the lease sales would redress a harm caused by BLM. And because the agency action challenged is the administration of the lease sales overall, not the approval of individual leases, they need not demonstrate that cancellation of any particular leases will remedy the harm.

Plaintiffs have met the requirements of Article III standing.

## III. MERITS ANALYSIS

Finally, we come to the merits questions, themselves of some complexity.

The challenges before us involve alleged violations of NEPA and FLPMA, and so are reviewed under the Administrative Procedure Act. *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1124 (9th Cir. 2007); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011). Under the APA, courts "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Review under the APA is "highly deferential." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012) (quotation marks and citation omitted). "We may not substitute our judgment for that of the agency." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003).

"Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). "An agency must provide a reasoned explanation for adoption of [a] new policy . . . but it need not demonstrate that the new policy is better than its prior policy." *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 682 (9th Cir. 2016); *see also FCC*

*v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "[A] policy change complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Fox Television*, 556 U.S. at 515–16).

On the merits, these appeals raise the following issues: In both suits, the government, Wyoming, and the Alliance challenge the district courts' determination that the lease sales were unlawful under FLPMA, and argue that vacatur of the lease sales was an abuse of discretion. In the Idaho litigation (*Western Watersheds*), the government, Wyoming, and the Alliance challenge the district court's conclusion that the lease sales violated NEPA. Finally, AEC argues that the district courts in both cases violated its due process rights by vacating the lease sales in its absence.

## A. The Participation Claims

We first address the Idaho district court's conclusion in *Western Watersheds* that the Phase One lease sales conducted under IM 2018-034 violated the public participation requirements of NEPA and FLPMA.

The lawfulness of IM 2018-034 itself is no longer at issue in this appeal. But several significant changes the Memorandum made to the public participation procedures

applicable to the lease sales are the basis for the lease sale
challenges, so we recap those changes here.

First, whereas IM 2010-117 mandated a 30-day
comment period for Environmental Assessments, the 2018
IM made participation during the NEPA process optional
(although BLM ultimately provided for shortened comment
periods for the sales conducted under it). Second, IM 2018-
034 specified that no additional public comment was
required for issuing a Determination of NEPA Adequacy; the
earlier IM had mandated a 30-day comment period for the
same process. And third, the 2018 IM halved the minimum
public notice period for lease sales from 90 to 45 days and
shortened the public protest period from 30 to 10 days.

Consistent with those changes, the lease sales conducted
after IM 2018-034 was issued featured shorter participation
periods than those conducted before its adoption. EA
comment periods for the June 2018 Nevada and Wyoming
lease sales were conducted under IM 2010-117 and lasted 30
days. In preparing for the September 2018 Wyoming sale,
BLM initially provided 30-day comment periods with
respect to two Environmental Assessments covering 124
parcels. After IM 2018-034 was adopted, but in preparation
for the same lease sale, the Bureau prepared an EA for an
additional 254 parcels with a comment period of only 14
days, "under the new policy's requirements." For the
September 2018 Nevada sale, the government issued
Determinations of NEPA Adequacy without conducting
additional participation, relying upon Assessments
previously conducted with 30-day comment or scoping
periods. Finally, for the September 2018 Utah sale, the
agency conducted a 15-day scoping period for 33 of the
parcels and a 15-day comment period for the other 76

parcels. Each of the sales included a 10-day protest period, consistent with IM 2018-034.

i.      Whether the Lease Sales Complied with NEPA

Appellants first argue that the district court erred in concluding that the shortened comment periods conducted for some of the Phase One lease sales violated NEPA.

Public participation under NEPA is governed by implementing regulations adopted by the Center for Environmental Quality. Those regulations provide that, in carrying out NEPA's requirements, an agency "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," 40 C.F.R. § 1500.1(b) (1978), and "shall to the fullest extent possible . . . [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment," *id.* § 1500.2(d) (1978). In preparing an Environmental Assessment, "[t]he agency shall involve environmental agencies, applicants, and the public, to the extent practicable." *Id.* § 1501.4(b) (1978).

The BLM's regulations implementing NEPA similarly require that, if the agency prepares an Environmental Assessment, it "must, to the extent practicable, provide for public notification and public involvement." 43 C.F.R. § 46.305(a) (2008). The "methods" of participation used are "at the discretion" of the agency. *Id.* "Publication of a 'draft' [Assessment] is not required." The BLM, for example, "may seek comments on [the Assessment] if they determine it to be appropriate." *Id.* § 46.305(b). Furthermore, BLM regulations specify that the agency "*should* use existing NEPA analyses for assessing the impacts of a proposed action and any alternatives," when available, *id.* § 46.120(a) (emphasis added), and that a new Environmental

Assessment is not required for actions "[t]hat are covered sufficiently by an earlier environmental document," *id.* § 46.300(a)(2).

"Although we have not established a minimum level of public comment and participation required by the regulations governing the EA and [Finding of No Significant Impact] process, we clearly have held that the regulations at issue must mean something." *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003). In *Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers*, we were more concrete, holding that "[a]n agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." 524 F.3d 938, 953 (9th Cir. 2008). We concluded in *Bering Strait Citizens* that this standard was met where an agency "widely disseminated" information about a proposed mining project, "received a high level of public comment," and "made substantial efforts to provide additional information" explaining the permitting process. *Id.*

To meet the agency's responsibility "to permit members of the public to weigh in with their views and thus inform the agency decision-making process," the participation period offered for comment must be sufficiently long to permit members of the public to weigh in on the decision in an informed manner. *Id.* The period must be long enough for participants to obtain and absorb the environmental information provided by the agency and then prepare their own analyses and critiques, including consultation with experts where appropriate. In *Fund for Animals v. Norton*, for example, a district court concluded that the agency's

provision of a two-week comment period was insufficient, as the comments produced in such a short time period were likely to be inadequate to allow the agency to take a "hard look" at the proposed regulation. 281 F. Supp. 2d 209, 226–29 (D.D.C. 2003).

With respect to the parcels for which BLM offered a 30-day comment period for the Environmental Assessment (the June 2018 Wyoming and Nevada sales, and 124 of the parcels identified by Expressions of Interest in the September 2018 Wyoming sale), there was no NEPA violation. Those Assessments were conducted under the participation provisions of IM 2010-117, which Western Watersheds agrees were sufficient.

As to the parcels for which the comment or scoping period was less than 30 days (254 parcels offered in the September 2018 Wyoming sale, and all parcels offered in the September 2018 Utah sale), or for which the agency prepared a Determination of NEPA Adequacy (the September 2018 Nevada sale), we do not decide whether the participation offered was inconsistent with NEPA's requirements when considered in isolation. The statute itself does not impose any substantive measure of adequate participation. And the agency did ultimately receive comments on the Environmental Assessments prepared for each of the contested sales, as well as protests challenging the parcels included.

A change in policy or in a planned agency action may nevertheless be arbitrary and capricious if the agency fails to provide a "reasoned explanation" for the change. Applying the factors identified in *Fox Television*, we conclude that the Bureau displayed "awareness that it [was] changing position" on lease sale procedures, *Fox*, 556 U.S. at 515–16,

by stating that IM 2018-034 "supersede[d] existing policy announced in IM 2010-117." The Bureau's given reason for adopting the new IM—"to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens," and "to expedite the offering of lands for lease"— indicated that the agency "believe[d]" that the new policy was an improvement upon the old. *Id.*

As to whether simplification and streamlining of oil and gas leasing decisions are "good reasons" for reducing the overall opportunity for public participation, we have noted that "[e]lections have policy consequences," and that an agency may reevaluate the weight it gives to different priorities. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d at 968. For example, an agency's decision under a new administration to "value[] socioeconomic concerns more highly than environmental protection" may be an acceptable justification for a change of heart. *Id.*

At the same time, the justification offered for a change in policy or agency action cannot be inconsistent with the purpose of the requirement being implemented. Here, the agency's decision to prioritize administrative efficiency and expedition of oil and gas production over deliberative decision-making that takes into account informed public comments is in direct tension with NEPA. NEPA's "twin aims" are to ensure that the agency consider "every significant aspect of the environmental impact of a proposed action," and "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. at 97. BLM failed entirely to acknowledge the potential costs of reducing public participation in leasing decisions, including that shortening the participation opportunity might lead to insufficient consideration of the

environmental impacts of its actions. Individuals and groups are unlikely to learn of the decision, research the environmental impacts of each sale—here, numbering in the dozens to hundreds—and compose a formal comment or protest marshalling facts and arguments in little over two weeks. By curtailing the opportunities available for public input in land management decisions for the sole purpose of more expeditious offerings of oil and gas leaseholds, the agency "entirely failed to consider an important aspect of the problem," one embedded in NEPA, the statute IM 2018-034 was implementing. *WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1064, 1069–70 (9th Cir. 2014).

Whether the agency's new policy is "permissible under the statute"—as interpreted by the CEQ regulations—is also doubtful when considered in the context of its earlier policy. *Fox Television*, 556 U.S. at 515–16. The agency has provided no explanation as to how a 15-day comment or scoping period engages the public "to the extent practicable," 40 C.F.R. § 1501.4(b), or to "the fullest extent possible," *id.* § 1500.2(d), where the agency offered a comment period twice as long under IM 2010-117. Similarly, the government does not justify its decision to eliminate participation in the preparation of the Determinations of NEPA Adequacy, when it previously allowed 30 days for public comment.

Accordingly, we conclude that the Bureau violated NEPA when it eliminated in some instances and severely shortened in others the various public participation periods for NEPA review during the Phase One lease sales without providing a "reasoned explanation" for the change.

ii.    Whether the Lease Sales Complied with FLPMA

The appellants also challenge the district court's conclusion that the decision to reduce the protest periods held for each of the Phase One lease sales violated FLPMA.

Unlike NEPA, FLPMA includes statutory provisions requiring public participation. FLPMA provides that "[t]he Secretary shall, *with public involvement* and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans." 43 U.S.C. § 1712(a) (emphasis added); 43 U.S.C. § 1712(f). "Public involvement" is defined to include "the opportunity for participation by affected citizens in . . . decisionmaking . . . with respect to the public lands." 43 U.S.C. § 1702(d). FLPMA does not specifically require that participation opportunities be offered for oil and gas lease sales, but it does mandate that the government "establish procedures" to provide the public with opportunities "to participate in, the preparation and *execution* of plans and programs for, *and the management of*, the public lands." 43 U.S.C. § 1739(e) (emphasis added); *see also* 43 U.S.C. § 1701(a)(5). The inclusion of the terms "execution," "management," and "decisionmaking" indicates a Congressional requirement that the Bureau provide opportunities for public participation on the adoption of land use plans *and* for down-the-line decisions as to the implementation of such plans.[17] *National*

---

[17] For this reason, we reject the argument, raised by the Alliance, that participation in the Plan Amendment process was sufficient to meet the statutory requirements under FLPMA. Nor does the existence of the Plan eliminate the need to perform site-specific NEPA analysis for future major federal actions. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998); 42 U.S.C. § 4332(C) (1975).

*Wildlife Federation v. Burford* so concluded, affirming the district court's conclusion that the government violated FLPMA when it failed to offer public participation opportunities related to the department's decision to revoke protective restrictions pertaining to particular federal lands. 835 F.2d 305, 322 (D.C. Cir. 1987). *Burford* rejected the argument that § 1739(e) requires participation only in the development of a land use plan, rather than in individual land use decisions, as such an interpretation "reads 'the management of public lands' language out of the statute." *Id.* (quoting 43 U.S.C. § 1739(e)); *see also Kraayenbrink*, 632 F.3d at 499.

Determining whether to engage in specific lease sale offers surely qualifies as a decision regarding the management of public lands. So the agency has a duty under FLPMA to involve the public in those decisions to some extent.

The exact form the participation must take is not specified in the statute. Although the agency "*may* suspend the offering of a specific parcel while considering a protest or appeal against its inclusion" in the sale, it is not *required* by regulation to permit a protest period. 43 C.F.R. § 3120.1-3 (2016) (emphasis added). And where a protest period or other opportunity for public input is offered, there is no indication of *how much* participation satisfies the statutory requirement. That the public was provided with *some* opportunity to protest the sales makes this case different from one where there is no opportunity at all for the public to inform the Bureau's lease sale decisions. *See Burford*, 835 F.3d at 322.

As with the NEPA challenge, we need not decide whether the agency's decision to offer a 10-day protest

period constitutes a violation of FLPMA considered in isolation. As we have explained, the agency acted arbitrarily and capriciously by failing to provide a "reasoned explanation" for its change in policy. Our analysis as to why "streamlining" and "efficiency" in the sale of oil and gas leases are not in isolation "good reasons" for the agency's change apply equally when analyzing the lease sales under FLPMA. And the possibility that the agency's actions were not compatible with the statute is even stronger, given the express language within FLPMA *requiring* participation in the "management" of the public lands. That requirement applies even when dispensing with or constricting such participation would be more efficient.

In sum, we conclude that BLM violated FLPMA when it limited participation in the Phase One lease sales without providing an adequate explanation for its change in policy.

### iii.    Harmlessness

The government, Wyoming, and the Alliance contend that the truncated comment and protest periods proved harmless because members of the public did ultimately submit comments on the Environmental Assessments and protest the sales, and because plaintiffs have not identified any additional information they would have submitted if given additional time. The APA instructs that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. "[I]t is the burden of the opponent of the action to demonstrate tha[t] an error is prejudicial." *Organized Vill. of Kake*, 795 F.3d at 969.**[18]**

---

[18] Western Watersheds contends that the appellants waived any harmlessness argument by failing to raise it before the district court. The

The district court cited numerous examples of how the shortened comment period limited the public's ability to provide "meaningful" input into the agency's decision. For example, members of the public noted that the curtailed timeframe made it infeasible to visit the parcels to conduct site-specific research, to consult with local stakeholders or organizational members about their knowledge and priorities, or to mobilize the public to write additional comments. The commenters generally noted that they submitted less detailed comments than they would have preferred. And some potential commenters noted that they were unable to provide comments at all.

The further contention by Wyoming and the Alliance that the advocacy groups were required to show that additional information would have changed the outcome of the lease sale is misplaced. The "required demonstration of prejudice is not a particularly onerous requirement." *Organized Vill. of Kake*, 795 F.3d at 969 (internal alterations and quotation marks omitted). Here, the statutes and regulations protect the right to public participation so as to assure informed agency decision-making, not to direct any particular outcome of the decision-making process. *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005). The suggestion that the plaintiffs were required to establish that the agency's decision would have been different had public participation been expanded misapprehends the statutory schemes.

---

government did argue in its opposition to summary judgment that the lease sales did not unlawfully curtail public participation because Western Watersheds and other entities were able to submit public comments. That submission was sufficient to preserve the issue here.

In sum, we conclude that BLM violated NEPA by severely shortening the comment periods relative to sales conducted under IM 2010-117 for 254 parcels offered in the September 2018 Wyoming sale, the September 2018 Utah sale, and the September 2018 Nevada sale, and that BLM also violated FLPMA by shortening the protest period for all Phase One sales.

## B.  The Prioritization Claims

We next address the Montana district court's determination in *Montana Wildlife Federation* that the June 2018 Wyoming lease sales conducted under IM 2018-026 violated FLPMA.

The district court held that IM 2018-026 violated FLPMA because it was inconsistent with the 2015 Plan in two ways: (1) it applied the Prioritization Objective only when a field office faced a backlog in expressions of interest; and (2) it transformed the Prioritization Objective into a "mere procedural requirement," rather than a substantive one. The court then concluded that the June 2018 Wyoming lease sales violated FLPMA because they were based on IM 2018-026.

### i.     Whether IM 2018-026 Violates FLPMA

As explained earlier, *see supra* pp. 38–41, we have concluded that we lack jurisdiction over the Montana district court's order vacating IM 2018-026. We nevertheless review its conclusion that the Memorandum violated FLPMA to the extent that decision underlies the validity of the Phase One lease sales.

FLPMA requires the government to "manage the public lands . . . in accordance with the land use plans . . . when they are available." 43 U.S.C. § 1732(a). Once a plan is adopted,

"[a]ll future resource management authorizations and actions . . . and subsequent more detailed or specific planning, [must] conform to the approved plan." 43 C.F.R. § 1610.5-3(a). "The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 69 (2004). Any BLM land use decision contrary to the plan "can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)." *Id.* "[W]e normally afford deference to an administrative agency's interpretation of its own regulations," including Resource Management Plans. *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). "[A]n agency's interpretation does not control," however, "where . . . it is plainly inconsistent with the regulation at issue." *Id.* (internal quotation marks omitted); *see also Kisor v. Wilkie*, 588 U.S. 558, 575–76 (2019); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005).

The 2015 Plan states that "[p]riority will be given to leasing and development of fluid mineral resources . . . outside of" sage-grouse habitat, and that "[w]hen analyzing leasing and authorizing development of fluid mineral resources" in sage-grouse habitat, "and subject to applicable stipulations for the conservation of [sage-grouse], priority will be given to development in non-habitat areas first and then in the least suitable habitat for [sage-grouse]." The Record of Decision issued with the Plan amendments in the

Rocky Mountain Region describes the Prioritization Objective in further detail:

> In addition to allocations that limit disturbance in [sage-grouse habitat], the [Plans] prioritize oil and gas leasing and development outside of identified [sage-grouse habitat]. This is to *further limit* future surface disturbance and *encourage* new development in areas that would not conflict with [sage-grouse]. This objective is intended to *guide development* to lower conflict areas and as such protect important habitat and reduce the time and cost associated with oil and gas leasing development by avoiding sensitive areas, reducing the complexity of environmental review and analysis of potential impacts on sensitive species, and decreasing the need for compensatory mitigation.

(emphasis added). That description emphasizes that the Prioritization Objective imposes an affirmative requirement on the Bureau to "guide" and "encourage" development away from sage-grouse habitat.

The context in which the 2015 Plan amendments were adopted reaffirms an overriding purpose of reducing the impacts on sage-grouse habitat. The amendment was a response "to the [U.S. Fish and Wildlife Services]'s March 2010 'warranted, but precluded' ESA listing petition decision for [the greater sage-grouse]." Through the amendments, BLM sought "to identify and incorporate appropriate measures in existing land use plans to enhance,

and restore [sage-grouse] habitat by avoiding, minimizing, or compensating for unavoidable impacts to [sage-grouse] habitat in the context of the BLM's multiple use and sustained yield mission under FLPMA." The Bureau specifically identified "oil and gas development" as a "major threat" to sage-grouse habitat.

Explicit in the 2018 IM's backlog emphasis, and also apparent in the manner in which the 2018 IM has been implemented, is an almost-exclusive reliance on responding to industry expressions of interest—EOIs—in leasing specific land parcels, rather than on independent agency determinations of which parcels to offer for oil and gas leases. This interpretation of the Prioritization Objective does not actively encourage development outside of or seek to minimize impacts on sage-grouse habitat and so is inconsistent with the 2015 Plan.

The stated "purpose" of IM 2018-026 is "to ensure consistency, certainty, and clarity when implementing" the Prioritization Objective, "while continuing to move forward expeditiously with oil and gas leasing and development, yet providing protections for [sage-grouse] and [sage-grouse] habitat management areas." The IM specifies that the government prioritize leasing outside of sage-grouse habitat only "[w]here the BLM has a backlog of Expressions of Interest." It further provides that "[s]tipulations such as No Surface Occupancy . . . and Controlled Surface Use may be used as the BLM implements the [sage-grouse] Plans." The IM surmises that "BLM can use these stipulations to encourage lessees to acquire leases outside of [sage-grouse habitat] due to fewer restrictions in those areas," but makes clear that "parcels may be leased within [sage-grouse] habitat management areas without first leasing parcels in non-habitat areas."

The Plan and Record of Decision, in context, make clear that "prioritization" requires something more than a method of sequencing the review of Expressions of Interest. Instead, it requires affirmative action by the agency to promote and encourage leasing outside of sage-grouse habitat. Under the "backlog" interpretation, absent constraints in budget or workload capacity, the agency will ultimately approve all proposed development in sage-grouse habitat. Indeed, that is exactly what has happened here. Since 2017, the Bureau has had sufficient resources to process all expressions of interest; there has never been a backlog of unreviewed expressions of interest for oil and gas leases in Wyoming. Such an interpretation relegates the Bureau to a passive administrator of the leasing process and does nothing to "encourage" or "guide development" to areas outside sage-grouse territory. Nor does leasing in accord with the 2018 IM "enhance, and restore [sage-grouse] habitat," nor "avoid" or "minimize[]" the impacts on sage-grouse habitat posed by oil and gas leasing.

The agency thus failed to draw a "rational connection" between the backlog requirement and the substantive, conservation-oriented goals of the 2015 Plan. *Forest Guardians*, 329 F.3d at 1099 (quoting *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990)). The government identifies no reason why BLM's efforts to protect sage-grouse habitat should come into play only when the agency is facing resource constraints. And in fact, that interpretation is directly inconsistent with the Plan's imperative to encourage and guide development outside of sage-grouse habitat. That imperative is derived from the agency's response to the "warranted, but precluded" listing decision, and the desire to take protective measures to reduce risk to the species. Absent

the substantive prioritization envisioned by the Prioritization Objective, the effort to avoid further risk to a threatened species could fail. Where an agency's interpretation conflicts with "indications of the [agency's] intent at the time of the regulation's promulgation," the agency's implementation of its regulation may be invalid. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

The 2018 IM's provision for lease stipulations is not sufficient to effectuate the Prioritization Objective. Lease stipulations may be used to impose surface occupancy or use restrictions in sensitive sage-grouse habitat, including breeding and nesting areas. But those stipulations are distinct from prioritization itself. The 2015 Plan provides that "[w]hen analyzing leasing and authorizing development of fluid mineral resources . . . *and subject to applicable stipulations* for the conservation of [sage-grouse], priority will be given to" non-habitat areas or less suitable habitat (emphasis added). The Plan therefore frames stipulations as distinct from prioritization. Even if the stipulations make development in sage-grouse habitat less attractive to potential leaseholders, measures taken to minimize the impact upon sage-grouse territory once a lease is granted cannot be said to "encourage" or "guide" development outside sage-grouse territory.

We note that there is no doubt that the government has the authority affirmatively to determine which parcels shall be offered for oil and gas leasing, as opposed to passively responding to expressions of interest. Under the Mineral Leasing Act, the government has discretion to determine which lands under its control will be offered for sale. The statute specifies that lands "which are known or believed to contain oil or gas deposits *may* be leased by the Secretary."

30 U.S.C. § 226(a) (emphasis added). The Bureau's regulations clarify that it has the authority to offer parcels "selected by" the agency for competitive auction, in addition to parcels nominated in Expressions of Interest. 43 C.F.R. § 3120.1-1(e), (f) (2016).[19] Furthermore, the agency may defer consideration of parcels for which it receives Expressions of Interest when those parcels are in sage-grouse territory.[20]

We emphasize that we do not specify the precise mechanism by which the government must implement the Prioritization Objective. But in some manner, the government must take an affirmative role in encouraging oil and gas leasing in non-sage-grouse habitat, rather than just

---

[19] Revisions made to the Bureau's regulations in April 2024 confirm this interpretation. The new regulations revise former § 3120.1-1 to read: "All lands eligible and available for leasing *may* be offered"—the previous regulation said, "*shall*"—"for competitive auction," including "[l]ands selected by the authorized officer."   43 C.F.R. § 3120.11(f) (emphasis added). The change from "may" to "shall" was made "to clarify that the Secretary retains the discretion to decide, even after lands have been determined to be eligible and available [in the land use planning process], what lands will ultimately be offered for lease." 89 Fed. Reg. 30945 (Apr. 23, 2024). The Bureau also proposed a new paragraph in § 3120.31 allowing the agency to include lands in a sale on its own initiative. Although the final rule does not include that provision, the agency explained that the addition "is unnecessary because § 3120.11(f) already gives the BLM the option to include lands selected by the authorized officer in a sale." *Id.* at 30946.

[20] The Bureau "clarif[ied] that it only self-nominates lands to protect the Federal minerals and the public interest," such as when the agency seeks to protect the mineral estate from drainage or when there are unleased minerals within an approved oil and gas agreement. *Id.* "As of December 14, 2023, approximately 92 percent of the lands under review came from an EOI." *Id.* But those practices do not limit the agency's authority to nominate parcels with the impact upon threatened species in mind.

passively processing expressions of interest, all of which may target, and pretty much have targeted, sage-grouse territory.

Our conclusion that IM 2018-026 is "plainly inconsistent" with the terms of the 2015 Plan is in tune with our decision in *Oregon Natural Resource Council Fund v. Brong*, 492 F.3d 1120, 1127 (9th Cir. 2007). There, we held that BLM violated FLPMA when it proposed a logging project in a protected forest area. We held the project "plainly inconsistent" with the terms of the Bureau's Forest Plan. *Id.* at 1125–26. The Plan designated preserve areas in which logging was generally prohibited, which were "to be managed to protect and enhance conditions of . . . forest ecosystems" that were the habitat of endangered species. *Id.* at 1126 (quoting Forest Plan). The Plan included guidelines for salvage operations permitted within reserve areas under limited conditions, while specifying that "salvage operations should not diminish habitat suitability now or in the future." *Id.* at 1127 (quoting Forest Plan). We thus interpreted the Plan to "clearly prioritize[] the preservation of [reserve] ecosystems over commercial benefits." *Id.*

In proposing a logging project that would permit the sale of timber salvaged from a protected area to private companies, *id.* at 1124, the agency failed to explain "how such action [was] compatible with the [Plan]'s direction to protect and enhance . . . ecosystems," *id.* at 1127. We determined that "BLM's interpretation of the . . . salvage guidelines [was] inconsistent with the [Plan's] clear direction" because it "construe[d] the guidelines as balancing environmental concerns and economic factors equally." *Id.* at 1127, 1131–32.

Like *Oregon Natural Resource Council Fund*, IM 2018-026 prioritizes administrative efficiency over the 2015 Plan's stated purpose of protecting sage-grouse habitat. It is therefore "plainly inconsistent" with the 2015 Plan. We therefore independently evaluate the June 2018 Wyoming leasing decisions to determine if they complied with the 2015 Plan.

> ii.     Whether the June 2018 Wyoming Lease Sale Violated FLPMA

The Bureau applied the backlog requirement in carrying out the June 2018 Wyoming lease sale. The result was that all 159 leases offered at the June 2018 Wyoming sale were partially or entirely within sage-grouse habitat. In response to comments, received during the preparation of the Environmental Assessment, objecting to the offering of parcels in sage-grouse territory, the Bureau noted that IM 2018-026 had replaced IM 2016-143 and clarified that "the BLM does not need to lease and develop outside of [sage-grouse] habitat management areas before considering any leasing and development within [sage-grouse] habitat."

The Bureau also received protests objecting that the lease sale failed to conform to the Prioritization Objective. In response to those protests, BLM cited the IM 2018-026 backlog provision and noted that the Wyoming field office "was able to adjudicate all the [expressions of interest] it had received," indicating that as no backlog existed, no parcels would be excluded. Because the backlog interpretation is not consistent with the 2015 Plan, a lease sale conducted in accordance with that limitation is similarly unlawful. *See Oregon Natural Resource Council Fund*, 492 F.3d at 1128.

The three alternative explanations provided by the government as to whether the Prioritization Objective was

implemented despite the application of the 2018 backlog policy are unpersuasive.

First, as we have explained, the fact that no parcels located outside of sage-grouse habitat had been nominated in the June 2018 sale does not eliminate the Bureau's obligations under the 2015 Plan. Simply "considering" whether non-sage-grouse inhabited parcels have been nominated by potential lessees is not enough to comply with the affirmative requirements of the Prioritization Objective. As noted, the Objective requires that the *agency* take action to guide and encourage development outside of sage-grouse habitat.

Second, the lease stipulations added to the June 2018 parcels do not satisfy the Prioritization Objective.[21] Not every parcel had stipulations related to sage-grouse protection. And, as already explained, stipulations are distinct from prioritization under the 2015 Plan.

Third, the Bureau's decision to defer the leasing of four parcels out of the 178 initially nominated does not amount to prioritization. The parcels and portions of parcels deferred were located in areas that *Wyoming* had designated as "core" sage-grouse area, but that had not been identified by BLM as priority management habitat. Under a BLM policy distinct from the 2015 Plan or IM 2018-026, the Bureau was required to defer those parcels until the agency aligned its plan with Wyoming's habitat boundaries. The Bureau's deferral of the leasing of the four parcels for reasons other than compliance with the Prioritization Objective does not demonstrate

---

[21] Contrary to the Federation's contention, the government raised this argument before the district court and so did not waive it.

compliance with the Objective. *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008).

Because the government proceeded under the 2018 backlog policy and so failed to comply with the Prioritization Objective, the 2018 Wyoming lease sales violated FLPMA.**[22]**

### C. The Intervention Claims

We next address an issue raised by AEC, which became a party to the suits after the Phase One summary judgment orders were entered. AEC contends that both district courts violated Federal Rule of Civil Procedure 19 and the Due Process Clause by vacating its lease rights without first joining it in the proceedings.

As an initial matter, we note that the Intervention Panel's decision does not control the outcome here. In its resolution of AEC's appeals of the district court decisions denying its motions to intervene, the Intervention Panel concluded that AEC was not adequately represented by an existing party and was entitled to intervention as of right under Rule 24(a). *Montana Wildlife Fed'n v. Haaland*, No. 20-35793, 2022 WL 42794 (9th Cir. Jan. 5, 2022); *W. Watersheds Project v. Haaland*, No. 20-35693, 2022 WL 42787 (9th Cir. Jan. 5, 2022). The Panel provided only a brief explanation for that

---

[22] The dissent maintains that we should consider whether the June 2018 Wyoming lease sale conformed with IM 2016-143. Dissent at 90. But IM 2016-143 was not in effect during the lease sale, and BLM's explanation for how the sale met the 2015 Plan's requirements was based on its compliance with IM 2018-026. We cannot know whether BLM would have proceeded with leasing all the relevant parcels if it had instead applied IM 2016-143. Moreover, plaintiffs had no obligation to challenge an IM that did not apply, so the validity of IM 2016-143 cannot be assumed.

conclusion with respect to AEC. But in coming to a similar conclusion with respect to Chesapeake, the Panel explained that, although the Alliance and its members shared the same "ultimate objective" of upholding the lease sales, Chesapeake had rebutted the presumption of adequate representation by making a "compelling showing" that the Alliance would not make all of its proposed arguments going forward. *W. Watersheds Project v. Haaland*, 22 F.4th at 841 (citing *Citizens for Balanced Use*, 647 F.3d at 898). Furthermore, "as a party with a legally protected interest in contract rights with the federal government, Chesapeake 'would offer [a] necessary element[] to the proceeding that other parties would neglect.'" *Id.* at 842 (quoting *Citizens for Balanced Use*, 647 F.3d at 898) (alterations in original). The Intervention Panel's analysis applies equally to AEC.

AEC contends that the Intervention Panel's conclusion as to adequate representation became the law of the case and controls the outcome here. "The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (quoting *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993)). That doctrine applies to "successive appeals in the same suit." *Carmona v. Carmona*, 603 F.3d 1041, 1052 (9th Cir. 2010).

But the law of the case doctrine applies only where "the issue in question" was "decided explicitly or by necessary implication in the previous disposition." *Thrasher*, 483 F.3d at 981 (quoting *Herrington*, 12 F.3d at 904). The Intervention Panel's decision was based on Rule 24, which covers intervention as of right and permissive intervention. The Intervention Panel did not decide whether the district courts erred in failing of their own accord to join AEC as a

necessary party under Rule 19. *W. Watersheds*, 2022 WL 42787, at *1; *Montana Wildlife Fed'n*, 2022 WL 42794, at *1. We have previously recognized that "in assessing an absent party's necessity under [Rule] 19(a), the question whether that party is adequately represented parallels the question whether a party's interests are so inadequately represented by existing parties as to permit intervention of right under [Rule] 24(a)." *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992). Because the inquiries are "parallel," it is arguable that the Intervention Panel decided "the issue in question . . . by necessary implication" and that the law of the case doctrine applies. *Thrasher*, 483 F.3d at 981 (quoting *Herrington*, 12 F.3d at 904).

Even so, there are exceptions to the law-of-the-case doctrine where: "1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) (quoting *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998)). Similarly, an earlier opinion is not controlling precedent where the relevant factual predicates differ. *Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001).

The exceptions for changed circumstances and different factual predicates apply here. The Intervention Panel's decisions hinged on the assumption that if allowed to intervene, the intervenors would make arguments before this Panel not presented by the Alliance. But, as it turned out, AEC on appeal adopted wholesale the arguments of the defendants and other intervenors on the merits, declining to present any additional argument—or any separate discussion at all—regarding the merits of this case. Instead, in its briefs

before us, "AEC adopt[ed] the briefing on the merits as provided by Federal Defendants, Wyoming, and the Alliance," stating only that "[f]or all the reasons set out by Federal Defendants, Wyoming, and the Alliance," the court's determination that the June 2018 Wyoming lease sale violated the APA, NEPA, and FLPMA "was wrong." The failure to raise new arguments after it represented to the Intervention Panel that it would do so qualifies as a "changed circumstance" and as a new factual predicate, rendering the Intervention Panel's determination that AEC was not adequately represented inapplicable here.

We therefore consider whether AEC was necessary and indispensable to the litigation without relying on the Intervention Panel's conclusion regarding adequacy of representation. Applying Rule 19 involves a three-step inquiry. *See Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012). First, we ask whether the absent party is necessary, or "required," under Rule 19(a). Second, we determine whether it is feasible to join the absent party. And third, if joinder is not feasible, we inquire whether the case can proceed without the absent party, or whether the party is indispensable, such that the action must be dismissed under Rule 19(b). *Id.* (citing *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 779–80 (9th Cir. 2005)).

Rule 19(a) provides that an absent party is necessary or "required" if "disposing of the action in the person's absence may . . . impair or impede the person's ability to protect" an interest "relating to the subject of the action." Fed. R. Civ. P. 19(a)(1). To qualify as a legally protected interest under Rule 19, the interest must be "more than a financial stake, and more than speculation about a future event." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990) (citation

omitted). A party's interest in enforcing compliance with administrative procedures is not sufficient, *see Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 971 (9th Cir. 2008), but "an absent party may have a legally protected interest at stake in procedural claims where the effect of a plaintiff's successful suit would be to impair a right already granted," *Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 852 (9th Cir. 2019). "[A]n interest that 'arises from terms in bargained contracts' may be protected," if that interest is "substantial." *Cachil*, 547 F.3d at 970 (quoting *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 (9th Cir. 2002)).

AEC has a legally protected interest in its lease rights. Several cases so establish. *Dine Citizens Against Ruining Our Environment v. Bureau of Indian Affairs*, for example, concluded that a mining company had a legally protected interest in an existing lease, rights-of-way, and surface mining permits that would be impaired by a judgment in the plaintiff's favor. *See* 932 F.3d at 853. Similarly, *Kescoli v. Babbitt* determined that tribes had a legally protected interest in an already-executed mining lease and settlement agreement. 101 F.3d 1304, 1311 (9th Cir. 1996). And as discussed in our jurisdictional analysis, *see supra* pp. 36–45, the practical effect of the district courts' decisions is to cancel the leases. The likelihood that AEC's legally protected interest could be impaired or impeded by the district court's order is therefore "more than speculation about a future event." *Makah Indian Tribe*, 910 F.2d at 558.

Nevertheless, a party whose legally protected interests are at stake is not required to be joined if those interests were "adequately represented by existing parties to the suit." *Dine Citizens*, 932 F.3d at 852 (quoting *Alto v. Black*, 738 F.3d

1111, 1127 (9th Cir. 2013)). Whether a present party adequately represents a necessary but absent party's interests depends on three factors: (1) "whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments;" (2) "whether the party is capable of and willing to make such arguments;" and (3) "whether the absent party would offer any necessary element to the proceedings that the present parties would neglect." *Id.* (quoting *Alto*, 738 F.3d at 1127–28).

The Federation and Western Watersheds contend that AEC was adequately represented by the Alliance—a regional trade association of which AEC is a member—in the proceedings in district court. We agree that AEC has failed to make the "compelling showing" necessary to rebut the presumption of adequate representation. *See Citizens for Balanced Use*, 647 F.3d at 898.

AEC and the Alliance share the same "ultimate objective." *Id.* AEC has failed to identify any merits argument not raised by the Alliance, which was, evidently, "capable and willing to make such arguments." *Id.* (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)). And AEC's status as a leaseholder does not offer any "necessary element[]" that the Alliance, as an organization representing leaseholders and development companies, did not offer. *Id.*

Finally, AEC knew of the litigation before the summary judgment order and yet did not move to intervene earlier because, as it stated in its motion to intervene in the Montana district court, "it believed the government and the Alliance already adequately represented its interests." "Where a party is aware of an action and chooses not to claim an interest, the district court does not err by holding that joinder was

'unnecessary.'" *Altmann v. Republic of Austria*, 317 F.3d 954, 971 (9th Cir. 2002) (quoting *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999)), *opinion amended on denial of reh'g,* 327 F.3d 1246 (9th Cir. 2003), *and aff'd on other grounds,* 541 U.S. 677 (2004). We therefore conclude that the district court did not violate Rule 19 in granting summary judgment in AEC's absence.

AEC's argument that the district court lacked power under the Due Process Clause to vacate its leases when it was not a party to the litigation is for the most part duplicative of its Rule 19 argument. In any case, any error in the district court's failure to join AEC before issuing summary judgment is harmless, because AEC has failed to specify any new merits arguments that would have changed the disposition of its rights had they been made in district court. We have previously noted that, even if a district court abused its discretion in denying permissive intervention, no relief is warranted where other parties had "made the same arguments as the [prospective intervenors]," and "the outcome of the case probably would not have been different if the district court had permitted" the intervention. *In re Benny*, 791 F.2d 712, 722 n.13 (9th Cir. 1986).

We conclude that the district courts did not err in vacating the lease sales in AEC's absence.

### D.  The Remedy

The remaining issue concerns the district courts' vacatur of the challenged lease sales.**[23]** A district court's choice of

---

[23] The Federation contends that the government and Wyoming waived this argument. But both parties argued before the district courts that that vacatur would be "excessive," would cause "significant disruption to

equitable remedy is reviewed for abuse of discretion. *Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*, 263 F.3d 1041, 1048 (9th Cir. 2001); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (noting that a regulation may be left in place on remand "when equity demands"). The APA authorizes a district court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Where a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA, but the court retains equitable discretion in "limited circumstances" to remand a decision without vacatur while the agency corrects its errors. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). We will assess these factors separately for each case.

### i.    *Montana Wildlife Federation*

The Montana district court concluded in *Montana Wildlife Federation* that vacatur was appropriate because "the errors here occurred at the beginning of the oil and gas

---

multiple state budgets," and "would unnecessarily burden oil and gas operators." Those assertions were enough to preserve the more specific arguments they make on appeal in support of those assertions. *See W. Watersheds Project v. U.S. Dep't of the Interior*, 677 F.3d 922, 925 (9th Cir. 2012).

lease sale process, infecting everything that followed." In the court's opinion, the economic harm that would result from vacatur of the lease sales—requiring the government "to return millions of dollars to the interested parties who won lease sales"—was not "significant enough to warrant remand without vacatur."

The first *Allied-Signal* factor—the seriousness of the error—requires the court to consider whether "on remand, a different result may be reached." *Pollinator Stewardship Council*, 806 F.3d at 532; *see id.* at 532–33 (vacating agency decision). The court may "look[] at whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule [or decision] on remand." *Id.* at 532.

The agency's error in the June 2018 Wyoming lease sales consists of applying the backlog requirement of IM 2018-026, which we have concluded is inconsistent with the 2015 Wyoming Plan*.* There is no "serious possibility that the [government] will be able to substantiate its decision" to carry out the Prioritization Objective through the backlog mechanism on remand. *Allied-Signal*, 988 F.2d at 151. With respect to the lease sales themselves, however, it is quite possible that some of the parcels sold could again be offered under an updated Memorandum consistently with the Prioritization Objective. Nevertheless, a lease sale that consists *exclusively* of parcels within sage-grouse habitat, where the agency made no effort to direct or encourage development in non-sage-grouse parcels, does not comply with the Prioritization Objective. Accordingly, a lease sale that adequately effectuates the Objective would almost certainly have a different composition than the June 2018 sale. The seriousness of the government's error is therefore significant.

The second *Allied-Signal* prong requires the court to consider the disruptive effect of vacatur. This is not a case where vacatur of a faulty rule risks environmental harm, an effect we have previously found to support leaving a rule in place on remand. *See, e.g.*, *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405-06; *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980). We have also determined that economic disruption weighs against vacatur under certain circumstances. For example, in *California Communities Against Toxics v. EPA*, we ordered remand without vacatur of an EPA rule where vacatur would be "economically disastrous" because it would "delay a much needed power plant," disrupt "a billion-dollar venture employing 350 workers," and probably result in "needless and duplicative legislat[ion]." 806 F.3d at 993–94; *see Allied-Signal*, 988 F.2d at 151 (holding that the disruptive consequences of vacatur, including that the agency would need to refund licensing fees, supported keeping the rule in place on remand).

Here, the district court concluded that vacatur of the lease sale would practically result in the government and states being required to cancel 158 leases and return around $36 million in lease revenues to the purchasers. Furthermore, canceling the leases deprives the lessees of property interests and disrupts investments in long-term development plans.

Despite these economic impacts, the district court concluded that "the errors here occurred at the beginning of the oil and gas lease sale process, infecting everything that followed." The "fundamental" nature of the government's error would make it infeasible for the agency to keep the current leases in place on remand. *Pollinator Stewardship Council*, 806 F.3d at 532. Prioritization must be implemented across a large geographic scale and over time.

The agency cannot simply assess whether individual leases issued adequately carry out the Objective. There are strong reasons for concluding that the only way for the agency to effectuate the Objective, and therefore comply with its obligations under FLPMA, would be to redo the lease sale from scratch—or, at least, that the district court did not abuse its discretion in so determining.

Accordingly, the Montana district court did not abuse its discretion in determining that the seriousness of the agency's errors outweighs the disruptive consequence to the leaseholders and government agencies and so vacating the lease sales.

### ii.    *Western Watersheds*

The Idaho district court vacated the Phase One lease sales, concluding that the economic effects of vacating the leases would be less significant than those recognized in *California Communities Against Toxics*, and that BLM's compliance with NEPA could become a "bureaucratic formality" were the leases left in place.

Compared to the Montana suit, the error in the Idaho suit is significantly less serious. The failure to offer adequate participatory opportunities in the lease sale is not insignificant, as "comment procedures are at the heart of the NEPA review process." *California v. Block*, 690 F.2d 753, 770 (9th Cir. 1982). But there is a greater likelihood that the agency could substantiate its decision on remand after affording more opportunities for participation.

The economic harm likely to result from cancelling the Phase One lease sales is identical in kind to that resulting from vacating the June 2018 Wyoming sale alone, but greater in scale. The government will be required to return

over $125 million in lease revenues, investment interests will be disrupted, and states will be required to forfeit funds. Although the district court stated that the economic effects of vacatur here were "not of the magnitude" held to warrant remand without vacatur in *California Communities Against Toxics*, *see* 688 F.3d at 993–94, that conclusion undersells the potential employment and economic impacts of unwinding five lease sales involving 677 leases. Furthermore, given the likelihood that many of the same leases may well be reissued after proper participation, it is not clear that remand without vacatur will have a substantially greater environmental effect. And the court can prevent harm from any leases that the agency ultimately cancels by enjoining surface-activity and drilling while the agency conducts the proper participatory process. *See Conner v. Burford*, 848 F.2d 1441, 1461 (9th Cir. 1988) (modifying the district court's order to enjoin surface-disturbing activity on any leases until the agency fully complied with NEPA and the ESA).

Applying the *Allied-Signal* test, we conclude that the disruptive consequences of lease vacatur in the Idaho case significantly outweigh the seriousness of the agency's procedural error, and that the district court abused its discretion in determining otherwise and so vacating the sales. We therefore remand the case to the district court with direction to vacate its vacatur order, to remand to BLM for further proceedings in compliance with NEPA and FLPMA, and to enjoin the Bureau from permitting any surface-disturbing activity in the interim.

## IV. Conclusion

In *Western Watersheds Project v. Haaland*, we conclude that the June 2018 Wyoming sale, the June 2018 Nevada

sale, and the sale of 124 parcels during the September 2018 Wyoming sale did not violate NEPA because the Bureau retained a 30-day comment period. To the extent that the district court held that those lease sales violated NEPA, we reverse its decision. We affirm the district court's conclusion that the remaining lease sales violated NEPA, and that all five lease sales violated FLPMA. Finally, we conclude that the district court abused its discretion in vacating the lease sales, and that the leases should remain in place upon remand to the agency but that all surface-disturbing activity shall be enjoined while the agency reconsiders the leasing decisions in compliance with appropriate public participation process.

In *Montana Wildlife Federation v. Haaland*, we affirm the district court's conclusion that the June 2018 Wyoming lease sale violated FLPMA. The district court did not abuse its discretion in vacating that lease sale.

Finally, we conclude that neither district court violated AEC's Rule 19 or due process rights by vacating its leases while it was not a party.

We lack jurisdiction over the remaining issues raised by appellants.

**AFFIRMED IN PART AND REVERSED IN PART.**

Boggs, Circuit Judge, concurring in part and dissenting in part.

I generally concur with the majority in its holdings on jurisdiction and standing, in both *Montana Wildlife Federation* and *Western Watersheds Project*. I also accept the court's merits analysis in *Western Watersheds*. However, I disagree with the majority on one point in its merits analysis of *Montana Wildlife Federation*, and another point in its jurisdictional analysis of *Western Watersheds Project*.

## I.  *Montana Wildlife Federation*: The Prioritization Claims

First, unlike the majority, I would hold that the June 2018 Wyoming lease sales in *Montana Wildlife Federation* were valid and did not violate FLPMA, because those sales complied with the 2015 Prioritization Objective.

As the majority states, the district court's decision to vacate IM 2018-026 in *Montana Wildlife* is unreviewable. But as the majority also notes, this court can nonetheless review the vacatur of the June 2018 Wyoming lease sales, because that ruling was injunctive in nature. The majority conducts this review in just two steps. First, it determines that IM 2018-026 itself violates FLPMA, by failing to comply with the 2015 Prioritization Objective. It then concludes that compliance with that (invalid) 2018 memorandum cannot save the lease sales. And second, the majority determines that the lease sales, standing alone, do not comply with the 2015 Prioritization Objective either. Accordingly, the June 2018 Wyoming sales themselves violate FLPMA.

Unfortunately, the majority misses a crucial intermediate step in its analysis. Vacating an agency rule does not leave a

vacuum behind in its place. Instead, vacatur generally functions to "reinstate the rule previously in force." *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005); *see PJM Power Providers Grp. v. FERC*, 88 F.4th 250, 265 n.81 (3rd Cir. 2023) (collecting cases). That is why the district court in *Western Watersheds* replaced the invalidated portions of a different rule, IM 2018-034, with provisions from a previous memorandum, IM 2010-117. *See Western Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1082–86 (D. Idaho 2020). So in this case, after judging IM 2018-026 to be invalid, we should next look to the previous rule, IM 2016-143.

Notably, the *Montana Wildlife Federation* plaintiffs do not question the 2016 memorandum's validity. If anything, the plaintiffs appear to argue that the Bureau of Land Management *should* have tried to comply with IM 2016-143. *See* MWF Ans. Br. at 38–40. The district court likewise viewed IM 2016-143 favorably, suggesting that it "show[s] how BLM can 'encourage new development' on non-sage-grouse habitat lands." *Montana Wildlife Fed. v. Bernhardt*, No. 4:18-cv-00069-BMM, 2020 WL 2615631, at *3 (D. Mont. May 22, 2020). It seems essentially undisputed by all parties, then, that if the 2018 Wyoming lease sales complied with IM 2016-143, those sales would also fulfil the 2015 Prioritization Objective, and comply with FLPMA.

In my view, after the majority determined that IM 2018-026 was invalid, it should next have asked whether the 2018 Wyoming sales complied with the preceding IM 2016-143. I would answer that they did. To be sure, IM 2016-143 held the Bureau's leasing and development decisions to a more stringent standard than IM 2018-026's mere "backlog requirement." But even under IM 2016-143 (plaintiffs' preferred approach to the leasing process), the Bureau was

wholly permitted to offer leases both inside and outside of protected sage-grouse habitat. IM 2016-143 is careful to note that it "is *not* intended to direct [the Bureau] to wait for all lands outside [sage-grouse] habitat areas to be leased or developed before allowing leasing within [sage-grouse habitats.]"

Instead, IM 2016-143 provides a "prioritization sequence" for officials to consider in responding to oil-and-gas industry expressions of interest (EOIs). Under this sequence, if any EOIs are made for lands outside of sage-grouse-habitat areas, those lands "should be the first priority for leasing in any given lease sale." But after "considering" EOIs for those high-priority lands, the prioritization sequence still gives the Bureau the flexibility to also consider EOIs for sage-grouse-inhabited areas as well. While "considering" what lands within a given category to lease (e.g. sage-grouse habitat or not), IM 2016-143 also instructs the Bureau to weigh certain factors, including whether the EOIs are for lands that are adjacent to already existing oil-and-gas leases, or if the lands are closer to sage-grouse leks (breeding grounds) as well as other "important life-history habitat features[.]" But in general, IM 2016-143 contemplates that any land that might be considered under the relevant Resource Management Plan is already "open for leasing." If not already open, it won't be considered. So by the time it begins considering specific parcels of land for leasing, the Bureau simply needs to follow the procedures prescribed by IM 2016-143 in determining what leases to prioritize selling first.

The June 2018 Wyoming lease sales complied with IM 2016-143. In responding to protests lodged after the Wyoming sales, the Bureau first defended the sales on the grounds that it was no longer bound by IM 2016-143, which

had then been superseded by IM 2018-026. However, the Bureau continued by noting that, although it was no longer required to do so, it had nonetheless "considered the items identified in . . . IM 2016-143," and disclosed its considerations in an Environmental Assessment. The Environmental Assessment, in turn, revealed that the Bureau performed "a detailed review" of the instant land parcels "in consideration of the . . . IM 2016-143 factors." It considered, for example, the high potential for oil and gas development in the instant parcels, and the countervailing factor that the parcels provided "nesting, wintering, and/or breeding habitat for Greater Sage-Grouse . . . ." These factors track IM 2016-143, which advised the Bureau to determine whether parcels had "higher potential for development" or whether they involved "important life-history habitat features [e.g. breeding grounds]" in deciding which parcels to prioritize. In accordance with the Prioritization Objective's requirements, the Bureau also imposed significant stipulations on many of the parcels. Such stipulations can operate to restrict the permitted uses of a parcel, or impose surface-occupancy limits.

Thus, the Bureau did consider the requisite substantive factors before deciding to offer the June 2018 Wyoming leases for sale, and in fact imposed further stipulations on the lessees to meet stated objectives. The only remaining question is whether the Bureau complied with IM 2016-143's prioritization sequence, which instructs the Bureau to *first* consider leasing all desired parcels belonging to the category of lands outside sage-grouse habitat. In the June 2018 Wyoming sales, the Bureau received EOIs for 178 parcels; after declining to lease 19 of them for reasons unrelated to sage-grouse conservation, the Bureau considered leasing the remaining parcels, and eventually

leased 158 of them. But notably, none of the parcels sought were outside of sage-grouse habitats; and so IM 2016-143's prioritization sequence, requiring the Bureau to first consider parcels outside of sage-grouse habitat was not applicable and was not violated.

Crucially, IM 2016-143 does not *require* the Bureau to lease all potentially available *non-habitat* parcels before beginning to lease any inhabited parcels as well. Nor does it require the Bureau to *set* aside some unspecified amount of inhabited parcels and exempt them from the leasing process entirely. Of course, the Bureau is certainly free to do so, and "regularly" did so under IM 2016-143. *Montana Wildlife Fed.*, 2020 WL 2615631, at *8. But nothing in IM 2016-143 (the plaintiff's preferred memorandum) mandates that the Bureau do anything more than *consider* its leasing decisions in a specified sequence, beginning with the category of uninhabited parcels, and guided by the memorandum's factors. Given these requirements, I disagree with the majority that the Bureau violated FLPMA in offering the June 2018 Wyoming leases, because that sale in fact appears to have complied with the uncontested IM 2016-143.

Likewise, even if the June 2018 Wyoming lease sale failed to comply with IM 2016-143, it did comply with the 2015 Prioritization Objective itself. On this issue, the majority faults the Bureau for not doing more than merely following a procedural prioritization sequence. In the majority's account, the 2015 Prioritization Objective imposes a substantive obligation on the Bureau to implement the leasing of lands outside of sage-grouse habitat even if no one expresses any interest in such lands—in other words, to perform meaningless actions before being permitted to perform meaningful ones. It also would mean that it must lease unlimited amounts of barren lands before a small

amount of fruitful land. *See* Maj. Op. at III.B.i, *supra* at 70, 72–73.

But that is simply not what "prioritize" means. Priority means the "status of being earlier in time or high in degree or rank; precedence." *Priority*, BLACK'S LAW DICTIONARY (12th ed. 2024). To prioritize is to give something this precedential, first-in-time status; that is why the 2015 Prioritization Objective requires the Bureau to give "priority . . . to development in non-habitat areas *first*" before moving on to sage-grouse-inhabited lands. *Montana Wildlife Fed.*, 2020 WL 2615631, at \*2 (emphasis added). But prioritization is not a zero-sum game: for example, if one prioritizes completing task A before moving on to tasks B and C, it does not follow that tasks B and C can never be completed. Put differently, priority means the right to go first; it does not mean the right to exclusivity. As applied here, the Bureau certainly should complete task A (granting development rights in any sought-after non-habitat areas) before moving on to task B (granting those rights within sage-grouse-inhabited areas). But so long as the Bureau completes task A first, I fail to see how it has not given "priority" to the requisite category of non-habitat lands. It has indeed accomplished what IM 2016-143 calls *sequential* prioritization. And because there were no EOIs for non-habitat lands in the June 2018 sale, the Bureau did not violate FLPMA by failing to offer to lease those non-habitat lands for which no interest had been expressed.

Both the majority and district court instead seem to read the Prioritization Objective as mandating that the Bureau *maximize* sage-grouse conservation at the expense of oil-and-gas development. But the 2015 Prioritization Objective's language reflects a more modest policy choice: it instructs that the Bureau should simply "prioritize" leasing

non-habitat lands when possible. After all, as the majority itself agrees, the Mineral Leasing Act grants the federal government broad discretion in leasing the lands under its control. 30 U.S.C. § 226(a). And as IM 2016-143 noted, all of the lands at issue here are already "open for leasing." Nothing in the Prioritization Objective, then, indicates a desire to curb this broad discretion; rather, the Objective only seeks to channel that discretion into a certain procedural sequence that may minimize the impact on sage-grouse populations, depending on bureaucratic efficiency and geological desirability of lands.

The majority supports its reading of "priority" by referencing language in the Record of Decision that was issued alongside the 2015 Prioritization Objective. This Record of Decision explains that the 2015 Resource Management Plan contained the Prioritization Objective in order to "further limit future surface disturbance" and "guide development to lower conflict areas." *Montana Wildlife Fed.*, 2020 WL 2615631, at *9. The majority reads aspirational terms such as "further limit" and "guide development" as providing additional requirements beyond the clear meaning of "prioritization" of non-sage-grouse-habitat leases. *See* Maj. Op. at III.B.i, *supra* at 68. This mischaracterizes the Record of Decision, which merely explains the policy goals underlying the prioritization objective, rather than adding additional requirements. Sequential prioritization alone is sufficient to achieve these policy goals as among desirable parcels. By giving non-habitat leases first priority, the Bureau offers lessees an incentive to avoid sage-grouse habitats by potentially granting them a quicker approval and sale process over habitat land that might never be reached for leasing. Priority is therefore the means by which the Bureau can achieve the

ends of "further limit[ing] future surface disturbance" and "guid[ing] development." And this incentive could grow even stronger when prioritization is combined with the stipulations the Bureau may impose on a lease, which might prove especially onerous for parcels in a sage-grouse habitat.

I conclude by emphasizing that the court's determination on this issue should be deferential to the Bureau. Unless the Bureau's action is "plainly inconsistent" with its own regulations (here, the Resource Management Plan and Prioritization Objective), that action merits deference. *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). To be sure, IM 2018-026's relatively flimsy "backlog requirement" may well have been inconsistent with the Prioritization Objective. But in response, both the majority and the district court go too far in the other direction, by imposing what the majority refers to as a "substantive" prioritization requirement (*See* Maj. Op. at III.B.i, *supra* at 70), and stretching the meaning of the term "priority" past its limits. The result is affirmance of the district court's decision to blanket vacate 158 distinct lease sales, many of which were likely not "plainly inconsistent" with the uncontested IM 2016-143, or the Prioritization Objective itself. Because I believe at least some of these sales merit deference under applicable law, I would reverse the district court on this specific issue.

## II. *Western Watersheds Project*: Chesapeake's Untimely Appeal

My second disagreement with the majority stems from the holding that intervenor-appellant Chesapeake failed to timely appeal the district court's order in *Western Watersheds Project*. On February 27, 2020, the district court entered its Phase One summary judgment order. On May 29,

2020, Chesapeake filed a notice of appeal, while also first moving to intervene in the case. After several rulings by both the district court and the Ninth Circuit, Chesapeake ultimately gained intervenor status on June 21, 2022, more than two years later.

However, little more than a month before Chesapeake finally became a party to this case, the Ninth Circuit issued a ruling in another case, *Evans v. Synopsys, Inc.*, 34 F.4th 762 (9th Cir. 2022). Nearly two years after Chesapeake had already filed its appeal, *Synopsys* retroactively held that this appeal was now late. Under *Synopsys*'s logic, which the majority adopts, Chesapeake should have understood the language in 28 U.S.C. § 2107(b) requiring "parties" to bring their appeal within sixty days to also apply to nonparties seeking intervenor status, like Chesapeake. *Id.* at 771–72. Seemingly, no other court had adopted this interpretation of 28 U.S.C. § 2107 at the time that Chesapeake first filed its appeal, in 2020.

I understand that *Synopsys* is now binding on this panel. But putting aside the apparent unfairness created by the lack of notice afforded to Chesapeake, I question the practicality of the majority's decision to deny jurisdiction over Chesapeake's appeal. At oral argument, Chesapeake's attorney seemed to indicate that, should this court deny jurisdiction over Chesapeake's appeal, Chesapeake would then likely seek Rule 54(b) certification at the district court on remand. *See* Fed. R. Civ. P. 54(b). And a Rule 54(b) determination at the district court would then restart Chesapeake's sixty-day window to appeal under 28 U.S.C. § 2107. *See SEC v. Capital Consultants, LLC*, 453 F.3d 1166, 1174 (9th Cir. 2006). Chesapeake's opponents in this case concede as much in their brief to this court. *Western Watersheds* Ans. Br. at 3, 5.

In short, a refusal to hear Chesapeake's appeal now will likely not settle the issue dispositively, since Chesapeake will have a chance to cure the untimeliness of its appeal at the district court. But the majority's reluctance to hear Chesapeake's appeal *will* continue to add further complexity and delay to a case that began more than six years ago, and which may continue to unfold over multiple phases of litigation for the foreseeable future. In the interest of judicial economy, then, I would prefer to reach the merits of Chesapeake's appeal today, rather then waiting further months or years before the appeal finally makes its way back to this court.

For each of these reasons, I respectfully dissent in part from the majority's ruling.